## IN RE THOMAS KAINE, AN ALLEGED FUGITIVE FROM GREAT BRITAIN.

Under the tenth article of the treaty of 1842, between the United States and Great Britain, a warrant was issued by a commissioner, at the instance of the British Consul, for the apprehension of a person who, it was alleged, had committed an assault, with intent to murder, in Ireland.

The person being arrested, the Commissioner ordered him to be committed, for the purpose of abiding the order of the President of the United States.

A *habeas corpus* was then issued by the Circuit Court of the United States, the District Judge presiding, when, after a hearing, the writ was dismissed, and the prisoner remanded to custody.

A petition was then presented to the Circuit Judge, at his chambers, addressed to the Justices of the Supreme Court, and praying for a writ of *habeas corpus*, which was referred by the Circuit Judge, after a hearing, to the Justices of the Supreme Court, in bank, at the commencement of the next term thereof.

At the meeting of the court, a motion was made, with the papers and proceedings presented to the Circuit Judge annexed to the petition, for writs of *habeas corpus* and *certiorari* to bring up the defendant and the record from the Circuit Court, for the purpose of having the decision of that court examined.

The motion was refused; the writs prayed for denied, and the petition dismissed.

On the 14th of June, 1852, Anthony Barclay, the British Consul at New York, addressed to Samuel R. Betts, Judge of the District Court of the United States for the Southern District of New York, and to any commissioners authorized to perform judicial duties in the matter, a requisition and complaint. It set forth, that it had been represented to Mr. Barclay, and was believed by him, that one Thomas Kane, or Kaine, or Cain, then of Cooleen, in Ireland, did, on or about the 5th of April, 1851, fire a pistol at one James Balfe, with intent to murder him; that a warrant to apprehend him was issued by a justice of the peace, but that said Kaine had absconded and fled to the United States. The requisition further stated, that the crime of which he had been guilty would have justified his apprehension and commitment if it had been committed within the United States. It then asked that a warrant for his apprehension might be issued, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence should be deemed sufficient, that it should be certified to the proper executive authority, in order that a warrant might issue for the surrender of such fugitive, under the treaty between the United States and Great Britain.

The truth of this complaint was sworn to by Mr. Barclay.

Kaine was arrested and brought before Joseph Bridgham, a Commissioner of the United States, at New-York.

The case was heard before the Commissioner, who decided, on the 23d of June, that the evidence was sufficient in law to justify the commitment of Kaine, upon the charge of assault with intent to commit murder; and ordered that the prisoner should be committed, to abide the order of the President of the United States.

A writ of *habeas corpus* was sued out, and allowed by Judge Betts. The writ was returnable to the Circuit Court of the United States; and, on the 3d of July, Judge Betts, the District Judge, then sitting alone in the Circuit Court, decided that the writ should be dismissed and the prisoner be remanded to the custody of the marshal.

On the 17th of July, the Acting Secretary of State issued a warrant, directing the marshal to deliver up Kaine to the British Consul.

On the 22d of July, Kaine presented a petition to Mr. Justice Nelson, at his chambers, praying for a writ of *habeas corpus*. The petition, although handed to Mr. Justice Nelson, was addressed to the Justices of the Supreme Court of the United States, which was not then in session.

On the 3d of August, Mr. Justice Nelson allowed the writ, and made it returnable on the 11th.

The marshal, in his return, stated the above facts, when, on the same day, Mr. Justice Nelson ordered as follows:

" The marshal having made the within return, Ordered that, in consequence of the difficult and important questions involved in the case, it be heard before all the Justices of the Supreme Court in bank, at the commencement of the next term thereof; and that, in the mean time, the prisoner remain in the custody of the said marshal."

A motion was made in this court for a *certiorari*, to bring up the proceedings of the Circuit Court, when holden by Judge Betts, which were printed, and ready to be used if the writ should be ordered.

In this condition of the case, the court passed the following order.

On consideration of the petition filed in this cause yesterday, and of the arguments of counsel thereupon had, as well in support of the application as against it, it is now here ordered by the court, that counsel have leave to argue the following questions, to wit:

1. Has this court jurisdiction upon the case, as certified by Judge Nelson ?

2. Can a certiorari issue to bring up the proceedings in the Circuit Court?

3. Assuming the court to have jurisdiction, and the proceedings in the Circuit Court to be legally before this court, is the party entitled to be discharged?

And it is further ordered by the court, that the same be, and hereby are, set down for argument on the first Monday of January next.

The unusual length of the opinions delivered by the Judges prevents the Reporter from inserting the arguments of counsel, which he would wish to do.

The case was argued by *Mr. Busteed* and *Mr. Brady*, for the petitioner, no counsel appearing on the other side.

As the opinions refer to a particular part of the proceedings and evidence below, it is necessary to insert the following.

*Warrant.   To John M. Higginson, Esq., Sub-Inspector, and his Assistants, this to execute.*

COUNTY OF WESTMEATH, *to wit:*

Whereas, complaint on oath has been made before her majesty's justices of the peace, of and for the said county of Westmeath, at Ballinlober, on this day, that one Thomas Kane did, at Cooleen, in said county of Westmeath, on this fifth day of April, instant, feloniously and maliciously fire a pistol, loaded with powder and lead, at one James Balfe, with the intent to murder him, and did then and there wound the aforesaid James Balfe:

These are, therefore, in her majesty's name, to charge and command you, immediately on receipt thereof, to apprehend and bring before some of her majesty's justices of the peace, of and for said county, the body of the aforesaid Thomas Kane, to answer the complaint, and to be further dealt with according to law.

Given under my hand and seal, this 5th day of April, 1851.

JAS. FEATHERSTON, *J. P.* [SEAL.]

To Sub-Constable Martin Meagher and his lawful assistants, this warrant legally to execute.

J. M. HIGGINSON, 3*d S. I.*

MOATE, 5th April, 1851.

Endeavored to execute same on the 11th and 12th of April, '51, at Liverpool, without effect.

MARTIN MEAGHER, *A. C.*

*In re Kaine.*

Endeavored to execute this warrant on the night of the 29th instant, with J. M. Higginson, Esq., S. I., and party; did not succeed.                                   JAMES GREEN, *Head Constable.*

Do.   do.   on the 7th June, 1851.
                          J. G., *H. C.*
Endeavored to be executed on the 6th July, '51, by
                          JAS. MOORE, *C.*
Do. Oct. 16.   } J. G., *H. C.*
Do.  do. 28.   }
Do. Nov. 10, '51.   M. M., *A. C.*
Do. Nov. 25, '51.   J. MALON, *S. C.*
Do. No. 29, '51.   A. C. MEAGHER
          and party.
Do. Dec. 21st.   M. COSTIGAN, *C.*
Do. do. 27th.
Do. do. 12th Jan'y, '52.
          A. C. MEAGHER and party.
Do. 22d Feb., '52.   By Sub-Inspr.
          and party.

MOATE, May 30th, '51.
This warrant endeavored to be executed on the morning of the 16th November, '51, without effect.
Endeavored to execute this warrant on Thos. Kane, night of the 29th Feb., '52, without effect.
          M. COSTIGAN, *Const.*
Endeavored to execute this warrant, night of the 13th March, '52, without effect.
          M. COSTIGAN, *Const.*

BOROUGH OF LIVERPOOL, *to wit:*

Whereas, proof upon oath hath this day been made before me, one of her majesty's justices of the peace for the said borough, that the name, James Featherston, to the within warrant subscribed, is of the handwriting of the justice of the peace within mentioned. I do hereby authorize Martin Meagher, who bringeth to me this warrant, and all other persons to whom it was originally directed, or by whom it may lawfully be executed, and also all constables and other peace officers of the said borough of Liverpool, to execute the same within the said late mentioned borough.

Given under my hand, this 11th day of April, 1851.
                                   R. E. HARVEY.

COUNTY OF WESTMEATH, *to wit:*

The information and complaint of James Balfe, of Shurock, farmer, taken 5th day of April, in the year of our Lord 1851, before the undersigned, one of her Majesty's justices of the peace in and for said county of Westmeath, who saith, that on this day, (the 5th day of April,) I was ploughing near that part of the land of Cooleen, in said county of Westmeath, which land a man named William Stones had lately been dispossessed of, and about which he had frequently threatened me, and told me a few days since that I might sow it, but that I should not

.In re Kaine.

live to reap it. Saith, about the hour of 12 o'clock at noon, on said day, a man named Thomas Cain, or Kain, came up to me when I was ploughing, armed with a case of pistols. On coming up to me he said to me, 'God save you; are you Peter Balfe?' I said, don't you know well I am not, Tom. He then asked, is that Stones' land? I said not; that it was the other side of the ditch. He then asked me, was I warned to have nothing to do with it, (Stones' land,) and I said not, except what I heard from Stones. He then said he came to warn me, and asked had I a prayer-book. I said not. Well, I have one myself; and he took both pistols in one hand, and took a prayer-book out of his pocket and threw it on the ground towards me. I stooped to take it up, and while stooping he fired one of the pistols at me; and on examining my person, I found the mark of a bullet and twenty-seven grains of shot in my side, just under my left arm. He was so close that the powder discolored my coat, and some of the said shot marks was on my left arm. I then jumped up and ran away, and he followed me some distance; he then turned back towards the horses, and I went into John Mularney's house, and sent for the horses. I saw no more of him. I knew him well for some years back, and I kept his prayer-book.

his<br>
JAMES ·X· BALFE.<br>
mark.

Sworn before me the day and year first mentioned, at Ballentubbe, in said county of Westmeath, this 5th day of April, 1851.

JAMES FEATHERSTON, H.

I certify that the information, copied on the other side hereof, is the original deposition upon which the original warrant has been issued by me for the apprehension of Thomas Kain, charged with shooting at James Balfe, of Shurock, in the county of Westmeath, with intent to murder him, the said James Balfe; and I further certify, that the said copy at the other side hereof is a true copy of said original deposition.

Dated the 25th day of May, 1852.

JAS. FEATHERSTON, H.<br>
<em>One of her Majesty's Justices of the Peace<br>
of the county of Westmeath, in Ireland.</em>

Witness present—MARTIN MEAGHER, A. C.

The following opinion was delivered by Mr. Justice CATRON, in which Mr. Justice McLEAN, Mr. Justice WAYNE, and Mr. Justice GRIER, coincided. Mr. Justice CURTIS delivered a separate opinion, and Mr. Chief Justice TANEY, Mr. Justice DANIEL, and Mr. Justice NELSON, dissented.

Mr. Justice CATRON.

The facts adduced on the part of Kaine, the applicant for our interference, show that a complaint was made out in due form by counsel, at the instance of the British government, through its agents, to secure the surrender of the fugitive; and that Mr. Barclay, the British Consul at New York, was specially employed, by direct authority of the British Minister, accredited to this government, to take the proper steps, according to the tenth article of the treaty of 1842; and furthermore, an officer of the Irish constabulary, who was able to identify Kaine, had been sent to Mr. Barclay, with letters from the British Home Department, to assist in the prosecution.

In pursuance of this authority, Mr. Barclay made the necessary affidavit, and caused Kaine to be arrested and brought before Joseph Bridgham, Esquire, a commissioner appointed by the Circuit Court of the United States, for the Southern District of New York; who reports the principal facts presented to him, as having occurred in Ireland, as follows: "The original warrant in this case was issued by James Featherstonhaugh, Esq., a justice of the peace of the county of Westmeath, Ireland, in which county the alleged crime was committed. The warrant was produced before me, together with a copy of the information or affidavit upon which said warrant was issued, said copy being certified according to the act of Congress, by the justice of the peace, who issued the warrant, and attested by the oath of the witness to be a true copy. James Balfe, the witness who made the information or affidavit, states, among other things, 'that on the 5th day of April, 1851, he was ploughing some land in the county of Westmeath, when Thomas Kaine came up to him, armed with a case of pistols, and after some conversation respecting some land, of which a man named Stone had lately been dispossessed, and respecting which the witness had been threatened, said, that he came to warn the witness Balfe about it, and asked if he, witness, had a prayer-book; witness said that he had not; Kaine then said that he had one himself, and threw it on the ground before the witness, who stooped to pick it up; that while stooping, Kaine fired one of the pistols at him, and that on examining his person he found marks of a bullet and twenty-seven shot in his side, just under his left arm; that he then fled, and that Kaine pursued him some distance, but finally turned back, and witness saw no more of him.'

"Upon this information the said Featherstonhaugh, justice of the peace for the county of Westmeath, granted his warrant, for the apprehension of Thomas Kaine, the prisoner, upon complaint on oath, made before him, that the prisoner had feloniously and maliciously fired a pistol, loaded with powder and

lead at the said James Balfe, with intent to murder him. This warrant, dated April 5, 1851, was immediately put into the hands of one Martin Meagher, constable of Westmeath, who made search for the prisoner and was unable to find him, or to execute the warrant." The said Meagher was produced before me, as a witness, and testified, among other things, that he was acting constable of the Irish constabulary, of the county of Westmeath, in Ireland, and had been such constable for several years ; that he knew Thomas Kaine, the prisoner, and had known him for three years and upwards ; that he had received, as such constable, the warrant before mentioned, to execute against the prisoner; that it was the original warrant; that he saw James Featherstonhaugh, the magistrate, execute it, and that he knew said Featherstonhaugh to be a justice of the peace of the county of Westmeath, in Ireland."

The case presented to us shows that the facts here stated are correctly made. Nothing is found in the proceedings before us, from which it appears that our government took any step to aid the British authorities in arresting and committing Kaine. And the Attorney-General declined to appear, on the part of the United States in this court, in opposition to this motion; nor did counsel appear on behalf of the British government, the argument before us being on behalf of the fugitive only.

On the foregoing state of facts the question arises, whether the United States Commissioner had power and jurisdiction to proceed without the previous authority of his own government.

Several obscurities in our extradition treaties with Great Britain and France were supposed to require legislation, on the part of Congress, to secure their due execution, and accordingly the act of August 12, 1848, was passed. By its provisions, the Judges of the Supreme Court, and those of the District courts of the United States, the Judges of the several State courts, and also Commissioners appointed for the purpose by any of the courts of the United States, are severally vested with power and jurisdiction to act, on complaint made under oath, charging a person with having committed any of the crimes enumerated within the foreign jurisdiction; and to issue a warrant for the apprehension of the person charged, so that he may be brought before such Judge or Commissioner, to the end that the evidence of criminality may be heard and considered; and if it be deemed sufficient to sustain the charge, under the provisions of the treaty, then it is made the duty of the Judge or Commissioner, to certify the fact of sufficiency, together with a copy of all the testimony taken before him, to the Secretary of State, so that a warrant may issue by the Executive, on the requisition of the foreign government, through its proper authorities,

for the surrender of the fugitives. And the person charged shall be committed to jail, and there remain under the warrant of the Judge or Commissioner until the surrender shall be made.

That an Executive order of surrender to a foreign government is purely a national act, is not open to controversy; nor can it be doubted that this executive act must be performed through the Secretary of State by order of our Chief Magistrate representing this nation. But it does not follow that Congress is excluded from vesting authority in judicial magistrates to arrest and commit, preparatory to a surrender.

The treaty with Great Britain is equally binding on us as the act of Congress, and it likewise confers jurisdiction and authority on the judges and magistrates of the respective governments, to issue warrants for the apprehension of fugitives; and for hearing and considering the evidence produced against them; and also provides, that the committing magistrate shall certify as to the sufficiency of the evidence, to the executive authority, so that a warrant of surrender may issue. But we are here more particularly considering the first and third sections of the statute; they are merely explanatory of the treaty, and altogether consistent with it. Congress was scrupulously careful, neither to limit or extend the treaty stipulations. According to the terms of the statute, no doubt is entertained by me, that the judicial magistrates of the United States, designated by the act, are required to issue warrants and cause arrests to be made, at the instance of the foreign government, on proof of criminality, as in ordinary cases when crimes are committed within our own jurisdiction, and punishable by the laws of the United States.

But it is insisted that, as these acts, in cases of fugitives, must be done in conformity to a treaty of one nation with another, and as a nation can only act through the supreme Executive authority, representing the nation, the Judges and Commissioners have no power to take the first step without being authorized to do so by the President, who represents the nation; and that the agents of the foreign nation have no right to call on our judicial officers to act, in advance of authority from the President.

On the other hand, it is supposed that the judicial magistrate proceeds in obedience to the treaty and act of Congress, by which he is invested with power to determine, independent of the President's commands, on the authority of those who apply to prosecute the fugitive; and that he must decide for himself, before the warrant issues, whether the prosecutor has the authority of his nation to demand the warrant, either from official

station, or by special deputation, in some satisfactory form, so that oppression of the party accused will be avoided.

That the British Consul in this instance had the authority of his government to demand the arrest and commitment, cannot be doubted; nor that the British government was, and now is, seeking the surrender.

Two acts of Parliament have been passed to carry the treaty of 1842 into effect in the British dominions; one in 1843, and the other in 1845; the authority of which is invoked as expressing the true construction of the treaty. They require one of the principal secretaries of state in England, if the fugitive is found in England, or the chief Secretary of the Lord-Lieutenant of Ireland, if the fugitive is found there, or if found in a colony abroad, the officer administering the government of the colony, to signify that the requisition has been made, and to require all magistrates and officers of justice within the jurisdiction where the requisition is made, to aid in apprehending the person accused, and committing him for the purpose of being delivered, according to the provisions of the treaty.

The British acts confer authority to arrest and commit, on judges of courts, and also on justices of the peace, and inferior police magistrates. Our act of Congress excluded justices of the peace and inferior magistrates, and limits the power to the Judges of the United States courts, and to Commissioners appointed for the purpose by them; and to the respective State Judges. And these, as already declared, are, in my opinion, authorized to proceed without a previous mandate from the executive department. Nor can I see any good reason why it should be otherwise. The judicial magistrate is bound to decide on the sufficiency of the affidavits on which the warrant of arrest is founded, and compelled to determine on the right to further prosecute, in every step of the proceeding; and why he should not have power to decide on the prosecutor's authority to institute the proceeding, it is difficult to perceive.

The people of this country could hardly be brought to allow an interference of the President with the Judges in any degree. The experiment was made during Mr. Adams's administration, in 1799, and signally failed. Jonathan (or Nathan) Robbins had been arrested as a fugitive, under the 27th article of Jay's treaty, for murder in the British fleet. He was imprisoned at Charleston under a warrant of the District Judge of South Carolina, and had been confined six months, when the Secretary of State addressed a letter to the Judge, mentioning that application had been made by the British Minister to the President, for the delivery of Robbins, according to the treaty. The letter said— "The President *advises and requests* you to deliver him

up." On this authority the prisoner was brought before the District Court on *habeas corpus*, and his case fairly enough heard, to all appearance, from the accounts we now have of it; and the Judge ordered the surrender in the following terms: " I do therefore order and command the marshal, in whose custody the prisoner now is, to deliver the body of said Nathan Robbins, *alias* Thomas Nash, to the British Consul, or such person or persons as he shall appoint to receive him."

The prisoner was accordingly delivered to a detachment of federal troops stationed there, to aid in the surrender; and they delivered him to an officer of the British navy, who was ready to receive him on board of a vessel of war, in which he was carried away.

That the Judge acted by order of the President, and in aid of the executive department, was never disputed; and the then administration was defended on the ground that the treaty was a compact between nations, and might be executed by the President throughout; and must be thus executed by him, until Congress vested the courts or judges with power to act in the matter; which had not been done in that instance. 5 Pet. Ap. 19; 7 Am. Law Jour. 13.

The subject was brought to the notice of the House of Representatives in Congress, by resolutions impeaching the President's conduct in Robbins's case, and where Mr. Marshall (afterwards Chief Justice of this court) made a speech in defence of the President's course, having much celebrity then and since, for its ability and astuteness. But a great majority of the people of this country were opposed to the doctrine that the President could arrest, imprison, and surrender, a fugitive, and thereby execute the treaty himself; and they were still more opposed to an assumption that he could order the courts of justice to execute his mandate, as this would destroy the independence of the judiciary, in cases of extradition, and which example might be made a precedent for similar invasions in other cases; and from that day to this, the judicial power has acted in cases of extradition, and all others, independent of executive control.

That the eventful history of Robbins's case had a controlling influence on our distinguished negotiator, when the treaty of 1842 was made; and especially on Congress, when it passed the act of 1848, is, as I suppose, free from doubt. The assumption of power to arrest, imprison, and extrude, on executive warrants, and the employment of a judicial magistrate to act in obedience to the President's commands, where no independence existed, or could exist, had most materially aided to overthrow the administration of a distinguished revolutionary patriot,

whose honesty of purpose no fair-minded man at this day doubts. Public opinion had settled down to a firm resolve, long before the treaty of 1842 was made, that so dangerous an engine of oppression as secret proceedings before the executive, and the issuing of secret warrants of arrest, founded on them, and long imprisonments inflicted under such warrants, and then, an extradition without an unbiased hearing before an independent judiciary, were highly dangerous to liberty, and ought never to be allowed in this country. Congress obviously proceeded on this public opinion, when the act of 1848 was passed, and therefore referred foreign powers to the judiciary when seeking to obtain the warrant, and secure the commitment of the fugitive; and which judicial proceeding was intended to be independent of executive control, and in advance of executive action on the case. And such has been the construction, and consequent practice, under the act of Congress and treaty by our executive department, as we are informed, on application to that department. What aid the executive will afford to a foreign government through its prosecuting attorneys, in cases arising under treaties, rests with itself, and not with us, as it acts altogether independent of the judiciary.

In my judgment, the law is as it should be. The treaty of 1842 settled the dividing line of jurisdiction between the United States and the British possessions in America, from the Atlantic ocean to the Rocky Mountains. On either side of the line, in great part, there is an extensive population; escapes of criminals from the jurisdiction where the crime was committed, to the other, must often occur; and, if criminals are taken at all, they must be arrested in hot pursuit, when fleeing from justice. To do so, a magistrate must be at hand to issue the warrant, cause the arrest, and adjudge the criminality. If Congress had delared that the President should first be applied to through the British Minister, and then issue his mandate to the judges to proceed in each case, the treaty would become nugatory in most instances; and in the entire range of country west of the Rocky Mountains, and for more than five hundred miles on this side of it, throughout the great western plains, no arrests could be made, nor would they be attempted.

What Great Britain has done by its legislation, cannot control our decision; we must abide by our own laws. If theirs are inconvenient, or supposed to violate the spirit of the treaty, it is the duty of our government to complain, and ask that they be reformed.

There is another striking consideration that must have had weight with our government, when the act of 1848 was passed. Judges and State magistrates arrest and commit our own citi-

10*

zens, without exception, in all instances, and for every grade of crime and offence against our State and Federal laws; they determine on the rights of the prosecutor to commence the proceeding; on the sufficiency of the affidavit on which the warrant of arrest is founded; on the evidence of criminality after the arrest is made; and imprison or take bail preparatory to a trial in court. Of this there is no complaint, nor any supposed danger of oppression, as the writ of *habeas corpus* promptly corrects all irregularities. Why, then, should a foreign criminal be more tenderly dealt by? He, too, has every benefit of the writ of *habeas corpus;* and furthermore can only be arrested by the authority of his own government; whereas, our citizens can be arrested at the instance of any person making the proper affidavit that the crime had been committed within our jurisdiction.

This country is open to all men who wish to come to it. No question, or demand of a passport meets them at the border. He who flees from crimes committed in other countries, like all others, is admitted; nor can the common thief be reclaimed by any foreign power. To this effect we have no treaty. But it is certainly due to our own citizens that they should be protected against murderers, and those who attempt to murder; and against pirates, house-burners, robbers, and forgers. That these should be extruded, on the demands of a foreign government where the crime was committed, and there punished, is due to humanity. Such wicked and dangerous men ought not to remain here. The case before us furnishes a striking instance of our dangerous condition in this respect. The prisoner successfully resisted and evaded execution of process on him by the civil authority in England, to which he fled from Ireland, for nearly a year, and in various instances, as the official returns on the original warrant show. And when the Circuit Court heard his case, the Judge tells us that it was to be deplored that, during the argument, the manifestations by the crowd thronging the court, to resist the detention of the prisoner, should be such that the marshal reported to the court he could not venture to remove him from the prison, in obedience to the writ, without an armed force; and therefore his case was heard, from necessity, in the prisoner's absence, for fear " that he would be rescued from the custody of the law by a mob."

It also appears, that when the warrant of the Secretary of State was delivered to the British consul and agent, he had to delay, and could not ship the prisoner, " on account of the expressed belief of the marshal, of the necessity of an armed, or powerful police force, to counteract outward excitement and threats of rescue."

This case is embarrassed with some other considerations. It

is urged that the Commissioner who committed Kaine had no power, because he had not been specially appointed for that purpose. The Circuit Court held, that the order of appointment covered the case of fugitives. That the order conferred on this special magistrate authority to commit in all other criminal cases, to the full extent that the United States Judges have authority, is admitted; and that he was a magistrate of the United States government, within the direct term of the treaty, cannot be denied, as I think. If there was a doubt, however, as to the meaning of the order of appointment, it was quite easy to remedy the defect in several ways. The order might have been amended, and a new commitment made, as one of the clerks of the Federal Court at New York was acting as Commissioner; or either of the Judges might have committed the defendant in the exercise of the original jurisdiction. But the Circuit Court has construed its own order, nor will I interfere with that construction.

It is proper, however, to. say, that Commissioners, acting under orders of appointment, couched in general terms, as this is, in its concluding part, have executed the act of 1848, without any one supposing they wanted power, until now; nor has any special appointment been made, to the mere end of executing the act, by any court of the United States, so far as I know. I feel quite safe in saying, that it has not been done in any judicial circuit in the United States.

The proof that Kaine shot Balfe, with an intent to commit murder, is conclusive, beyond controversy, if competent; and the only question that can arise on the merit, is, whether the copy of Balfe's deposition, received by Commissioner Bridgham, was admissible.

It is objected, " that there was no evidence what the authority of the foreign magistrate was; whether to issue warrants, or to take cognizance of offences, and of what grade of offences."

The Commissioner held, that it was not necessary to produce the commission under which the Irish magistrate held office, and acted, nor to prove its contents, proof that he publicly discharged the duties being *primâ facie* evidence of his official character; the presumption being, that if a man regularly acts in a public office, he has been rightfully appointed. Meagher proves that the Irish magistrate thus acted, and his proof is fortified by the original warrant produced by him. It is official and authentic on its face.

There was sufficient evidence, in my opinion, before the Commissioner, to establish the official character of the magistrate, before whom Balfe's deposition was taken; and that the copy proved to be a true copy, by Meagher, was properly received,

under the 2d section of the act of 1848. It requires, that copies shall be certified under the hand of the person issuing the warrant, and proved to be true copies, by the oath of the party producing them. And I think it is doubtful whether Congress did not mean to say, that the official character of the magistrate should be *primâ facie* established by the deposition and certificate, without further proof of his authority.

After Kaine had been committed by the Commissioner, the Circuit Court was applied to, by petition, for writs of *habeas corpus* and *certiorari*, to bring up the prisoner and proceedings before that court. The writs were issued, and a very thorough examination had of the law and the facts. The court decided that the commitment was, in all respects, legal and proper, concurred with the Commissioner's decision, and ordered the prisoner to be remanded to the custody of the marshal, under the commitment of the Commissioner.

The opinion and judgment of the District Judge, who presided, are before us, and form part of the proceedings presented here; and it is due to that able jurist to say, that he brought to the consideration of the case a degree of patience, learning, and capacity rarely met with, and which no other Judge can disregard without incurring the risk of error.

After this careful consideration of the case, in open court, the Circuit Judge granted a second writ of *habeas corpus*, and thereby stayed the warrant for Kaine's extradition, awarded by the Secretary of State, and which had been delivered to the British authorities; and the matter was again brought before that Judge, at chambers, but not deeming it proper to act, he adjourned the proceeding, as presented to him, into this court; and of the case thus presented, we are called on to take jurisdiction. Cognizance could only be taken of the matter, on the assumption that original jurisdiction existed in the Circuit Judge to act, but on which he did not act; and the case comes here as one of original jurisdiction, which we are called on to exercise; and as the Constitution declares that this court shall only have appellate powers, in cases like this, it follows that the transfer made by the Circuit Judge is of no validity, and must be rejected. Foreseeing that we might thus hold, the counsel for the prisoner, Kaine, also moved this court, on petition, with the papers and proceedings presented to the Circuit Judge annexed thereto, for writs of *habeas corpus* and *certiorari*, to bring up the defendant, and the record from the Circuit Court, to the end of having the decision of that court examined here.

The case has been carefully and ably argued before us, on behalf of the prisoner; and anxiously considered by this court,

on every ground presented, and especially on its merits; and I am authorized to say, that Judges McLean, Wayne, and Grier, agree with the views above given, and that we refuse the motion for the writ, on the merits. We are not disposed, under the circumstances, to exercise the jurisdiction of this court in the case.

Mr. Justice CURTIS.

To state intelligibly the grounds on which I rest my judgment in this case, it is necessary to advert to the proceedings by means of which it comes before us.

On the 14th day of June, 1852, a complaint, on oath, was presented to Joseph Bridgham, Esq., one of the commissioners to take affidavits, &c., appointed by the Circuit Court of the United States, in the Southern District of New York, charging, that Thomas Kaine, in that part of the dominions of Her Britannic Majesty, called Ireland, had feloniously assaulted one John Balfe, and inflicted upon him a wound with a pistol, with intent to murder him; that a warrant to arrest Kaine, for this felony, was issued by a justice of the peace, duly authorized for this purpose, but Kaine having fled from justice, took refuge in the United States, and was then in the Southern District of New York; and the complainant, who describes himself as the Consul of Her Britannic Majesty in New York, prays that a warrant may be issued to apprehend Kaine, to the end that such proceedings may take place for his surrender to the authorities of Great Britain, as are required by the treaty between the United States and Great Britain, and the act of Congress, passed to carry that treaty into effect.

A warrant did issue, Kaine was arrested, and a hearing took place, the result of which was, that the Commissioner ordered Kaine to be committed, pursuant to the treaty, to abide the order of the President of the United States, in the premises.

In this stage of the proceedings, a writ of *habeas corpus* was issued by the Circuit Court of the United States, for the Southern District of New York. Kaine was brought before that court, in which the District Judge then presided, and after a hearing, upon all the objections raised by the Prisoner, the writ of *habeas corpus* was dismissed, and Kaine was remanded and continued in the custody of the marshal, under his arrest and commitment by the process of the Commissioner. On the 22d day of July, 1852, Kaine presented to Mr. Justice Nelson, at chambers, a petition addressed to the Justices of the Supreme Court of the United States, in which he sets forth, that he is detained in custody by an order made by Judge Betts, on the 9th day of July, 1852, that his detention is illegal, and praying

for a writ of *habeas corpus* to inquire into the cause of his commitment.

Upon this petition, Mr. Justice Nelson made an order, under which a writ issued, which is as follows:

The President of the United States of America, to the United States Marshal for the Southern District of the State of New York, or to any other person, or persons, having the custody of Thomas Kaine, greeting:—

{ Seal of the Circuit Court of the Southern District of New York.

We command you, that you have the body of Thomas Kaine, by you imprisoned and detained, as it is said, together with the cause of such imprisonment and detention, by whatsoever name the said Kaine mə ɹe called or charged, before our Justices of our Supreme Coɪ ɪt of the United States, at his chambers, in Cooperstown, New York, on the 11th day of August, instant, to do and receive what shall then and there be considered, concerning the said Thomas Kaine.

Witness, SAMUEL NELSON, Esq., one of our Justices of our said Court, this third day of July, eighteen hundred and fifty-two.

RICHARD BUSTEED, *Attorney for petitioner.*

Upon the return of the marshal to this writ, a hearing was had, which resulted in the following order, made by Mr. Justice Nelson:

COOPERSTOWN, August 11, 1852. *At Chambers.*

The marshal having made the within return, Ordered, that in consequence of the difficult and important questions involved in the case, it be heard before all the Justices of the Supreme Court, in bank, at the commencement of the next term thereof; and that, in the mean time, the prisoner remain in the custody of the said marshal. S. NELSON.

These are the proceedings which have brought this case here, and the first question which arises is, whether, under these proceedings, we have any power to act?

In my opinion, we have not. Passing over the question, whether the court itself could rightfully issue a writ of *habeas corpus* upon the case made before Mr. Justice Nelson, which I shall consider hereafter, I think a Judge of the court in vacation, at his chambers, has no power to grant a writ of *habeas corpus* out of this court, or to make such a writ returnable before himself, and then adjourn it into term; and, that if he had such power, it has not been exerted in this case, the writ actually issued not being a writ out of this court, or upon which, as process, this court can take any action.

It is not to be doubted, that whatever jurisdiction belongs to the Supreme Court, under any writ of *habeas corpus ad subjici-*

*endum,* is appellate. · It is equally clear that no part of the appellate jurisdiction of this court can be exercised by a single Judge, at his chambers.   It is also well settled, that the question, whether such a writ of *habeas corpus* shall issue from this court, is one upon which the court ought to pass, before the writ issues; the allowance of the writ being an exercise of its limited appellate jurisdiction, which only the court itself has the power to exert.   Ex parte Milburn, 9 Peters, 704.

From these premises it also follows, that if such a writ be issued from this court, it cannot be made returnable before a Judge, at chambers, for the reason, that he cannot there exercise any appellate power under it.   And, finally, this writ does not bear the seal of the Supreme Court, is not tested by the Chief Justice, or signed by the clerk, as is required by the act of Congress, (1 Stat. at Large, 93,) but bears the seal of the Circuit Court of the Southern District of New York, is tested by Mr. Justice Nelson, is not signed by any clerk, and therefore cannot be considered process issuing out of this court, or upon which we can take jurisdiction.

I concur with my brethren in the opinion, that under this writ the court can pass no order whatever.

It remains to consider the application made by the counsel of Kaine, to have another writ of *habeas corpus* allowed by this court.

The first question is, whether we have jurisdiction to act under the writ, if allowed in the case shown by the petitioner. There are some principles, bearing on this question, which are settled.   That this court has no original jurisdiction to issue a writ of *habeas corpus ad subjiciendum,* and can grant such a writ only in the exercise of its appellate jurisdiction, and consequently, by means of it, can revise only the proceedings of those tribunals over which, and in respect to which, it has an appellate control, have been so repeatedly and uniformly decided here, that they must be considered as finally settled.   Marbury *v.* Madison, 1 Cr. 175 ; Ex parte Bollman, 4 Cr. 100, 101; Ex parte Kearney, 7 Wheat. 38 ; Ex parte Watkins, 3 Peters, 193, S. C. 7 Peters, 568 ; Cohens *v.* State of Virginia, 6 Wheat. 264; Osborn *v.* Bank of the United States, 9 Wheat. 738 ; Ex parte Madraza, 7 Peters, 627; Ex·parte Barry, 2 Howard, 65.   That no such control, by means of an appeal, writ of error, or other proceeding, can be exercised by this court over a Commissioner, acting under the authority of an act of Congress, or under color of such an authority, and that this court has no power in any way to revise his proceedings, I consider equally clear.   In Ex parte Metzger, (5 Howard, 176,) it was determined that a writ of *habeas corpus* could not be allowed, to examine a commitment

by a District Judge, at chambers, under the treaty between the United States and France, for the reason that the Judge, in ordering the commitment, exercised a special authority, and the law had made no provision for the revision of his judgment. The same reason applies to the action of this Commissioner. Not only has the law made no provision for the revision of his acts by this court, but, strictly speaking, he does not exercise any part of the judicial power of the United States. That power can be exerted only by Judges, appointed by the President, with the consent of the Senate, holding their offices during good behavior, and receiving fixed salaries. (Constitution, art. 3, sec. 1.) The language of Mr. Chief Justice Taney, in United States v. Ferreira, (13 Howard, 48,) in speaking of the powers exercised by a District Judge, and the Secretary of the Treasury, under the treaty with Spain, of 1819, describes correctly, the nature of the authority of such a Commissioner as acted in the case before us. "The powers conferred by Congress upon the Judge, as well as the Secretary, are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is not judicial, in either case, in the sense in which judicial power is granted by the Constitution to the courts of the United States."

Since, then, the Commissioner did not, in this case, exercise any part of the judicial power of the United States, and no mode has been provided by law to transfer the case on which he acted into any court of the United States, and thus bring that case under the judicial power, this court can have no appellate control over it; because its appellate power cannot extend beyond the action of the inferior courts, established by Congress to take original jurisdiction under the Constitution, and which exercise judicial power therein conferred. As it is plain, then, that to revise the proceedings of the Commissioner by a writ of *habeas corpus*, would be an exercise of original, and not of appellate jurisdiction, the inquiry recurs whether we can grant the writ for the purpose of revising the decision of the Circuit Court, made upon the writ of *habeas corpus* issued by that court.

This court has appellate power only in the cases provided for by Congress. United States v. Moore, 3 Cr. 159; Durousseau v. United States, 6 Cr. 307.

We must therefore find, in some act of Congress, power to review the decision of a circuit court simply remanding a prisoner on a writ of *habeas corpus;* otherwise this writ cannot be allowed. The only grant of power, supposed to be applicable to such a case, is contained in the fourteenth section of the Judiciary Act, (1 Stat. at Large, 81,) which authorizes this

court to issue writs of *habeas corpus;* and the question is, whether a grant of power to issue a writ of *habeas corpus* " to examine into the cause of commitment," is a grant of power to review this particular decision of the Circuit Court.

As the only jurisdiction conferred arises from the authority to issue the writ, and the consequent authority to proceed under it, the exigency of the writ must necessarily limit the jurisdiction. So far as the subject-matter involved in this writ extends, the jurisdiction exists, and no further.

That subject-matter is " the cause of the commitment." So that we must ascertain whether the decision of the Circuit Court is the cause of the commitment. If it is, we have jurisdiction to inquire into it; if it is not, then that decision is not within the exigency of this writ, forms no part of its subject-matter, and is not within our appellate control.

To determine whether the decision of the Circuit Court is the cause of the commitment in this case, it is necessary to have distinctly before us the precise acts which have been done, and then to consider their legal effect.

On the 29th day of June, 1852, the Commissioner, after the previous proceedings which have been mentioned, made the following warrant to the Marshal of the Southern District of New York:

UNITED STATES OF AMERICA,
Southern District of New York, *ss.*
*In the matter of Thomas Kaine.*

This case having been heard before me, on requisition, through Anthony Barclay, Esquire, Her Britannic Majesty's Consul at the Port of New York, that the said Kaine be committed for the purpose of being delivered up as a fugitive from justice, pursuant to the provisions of the treaty made between the United States and Great Britain, August 9th, 1842, I find and adjudge that the evidence produced against the said Kaine, is insufficient in law to justify his commitment on the charge of assault with intent to commit murder, had the crime been committed within the United States. Wherefore, I order that the said Thomas Kaine be committed, pursuant to the provisions of the said treaty, to abide the order of the President of the United States in the premises.

Given under my hand and seal, at the city of New York, this 29th day of June, 1852.

(Signed,) JOSEPH BRIDGHAM, [ L. S. ].
*United States Commissioner for the Southern District of New York.*

Directed to the Marshal of the Southern District of New York.

Under this warrant Kaine was held by the marshal, at the time the writ of *habeas corpus* was issued by the Circuit Court; and upon the return of that writ, several questions of law were raised and argued, touching the jurisdiction of the Commissioner, and the regularity and validity of his proceedings; and on the 9th day of July, 1852, the Circuit Court gave its decision, to the effect that the Commissioner had jurisdiction, and had proceeded regularly, and concluded by passing the following order:

" The court accordingly adjudges that the commitment and imprisonment of the prisoner for the causes in the return to the *habeas corpus* in the case set forth, are sufficient cause and warrant in law for his detention by the marshal.

" Therefore, it is ordered by the court, that the writ of *habeas corpus* allowed in this case be dismissed, and that the prisoner be remanded and continued in the custody of the marshal, under such his arrest and commitment by the aforesaid process."

Is this order " the cause of the commitment " of Kaine within the meaning of a writ of *habeas corpus ?* With the utmost respect for the opinions of those of my brethren who have so considered it, I cannot come to that conclusion. It seems to me, that it is not the cause of the commitment; either in substance or in form.

In substance, it is merely a refusal to discharge the prisoner from an existing commitment, because the cause of that existing commitment is found sufficient in law. It creates no new cause; it simply declares the existing cause to be sufficient. It makes no new commitment, and issues no new process as an instrument for it, but only pronounces the old process valid, and consequently the continuance of the commitment under it legal. The custody was at no time changed. Certainly, when a prisoner is brought into court upon the return of a *habeas corpus ad subjiciendum*, he is then in the power and under the control of the court; but until the court makes some order changing the custody, it remains. The court may, in some cases, admit to bail, and may also take order for the future production of the prisoner, without bail; but in all cases, until the court makes some order changing the custody, either for the care or security of the prisoner, or founded on the illegality of his commitment, the original custody continues. In this case, no such order was made.

If, then, this order of the Circuit Court created no new cause of commitment, made no new commitment, and only pro-

nounced the existing cause sufficient, and the existing custody lawful, I cannot perceive how that order can, in substance, be treated as the cause of the commitment of Kaine.

Nor, in my apprehension, is it so, even in form.  In form, the court first adjudges that the causes set forth in the return, are sufficient, and, " therefore, it is ordered, by the court, that the writ of *habeas corpus* allowed in this case, be dismissed, and that the prisoner be remanded, and continued in the custody of the marshal, under such his arrest and commitment by the aforesaid process."

This clearly expresses, in words, precisely what would be the legal effect of dismissing the writ of *habeas corpus*, without those words.  And I do not perceive how it can be more plainly expressed than by the language of this order, that the process of the Commissioner, being found sufficient, the commitment by that process is not interfered with.

It is true, the order contained the word, remanded, but in the context, where it stands, it means only that the command of the writ is no longer operative, and that the court would exercise no further control over the body of the prisoner, and not that, being out of the custody of the marshal, he is recommitted to him anew, for the words are " remanded and continued in the custody of the marshal, under such his arrest and commitment by the aforesaid process."

In point of form, the same order would have been passed if it had been found by the Circuit Court, on the return of the writ, that the prisoner was not held under, or by color of the authority of the United States, and therefore that, under the Judiciary Act, the court had no power to relieve him by *habeas corpus*.  It could not be contended that, after such an order, the prisoner was confined by order of the Circuit Court, and that its order was the cause of his commitment, yet in such a case the writ must have been dismissed, and the prisoner remanded.

But whatever literal interpretation might be put upon the precise words employed in the order, I should be unable to find " the cause of the commitment" in an act of the court dismissing a writ of *habeas corpus*, because the cause of the commitment shown by the return is found sufficient.  The cause of the commitment is to be looked for in the warrant under which it began, and has been continued, and not in the decision of a court pronouncing that warrant valid.

I have thus far considered this question of jurisdiction upon those principles which seem to me applicable to it.  It remains to examine the former decisions of this court, to ascertain whether the question is determined by authority.

There are two cases which have been chiefly relied on at the bar. The first is Ex parte Burford, 3 Cr. 448. As this case has many facts in common with the case at bar, it is necessary carefully to examine it. Without detailing the preliminary proceedings, it will be sufficient to say, that Burford was committed to the jail of the county of Washington, in the District of Columbia, by a warrant of certain justices of the peace, which was defective, because it did not state " some good cause certain, supported by oath." That he was brought before the Circuit Court for the District of Columbia, upon a writ of *habeas corpus*, and, after a hearing, that court passed the following order, which, as it is not given in the report of the case by Judge Cranch, and as its terms seem to me to be important, I have procured from the original record in this court.

"*January 8th*, 1806. John A. Burford was brought into court by the Marshal of the District of Columbia, agreeably to the *habeas corpus* issued by this court, on the 4th instant, with the cause of his commitment annexed thereto, (which *habeas corpus* and cause of commitment are hereunto annexed,) whereupon, all and singular the premises being heard, and by the court have been fully understood, the court order, that the said John A. Burford, enter into a recognizance, himself in $1,000, and one or more sureties in the like sum, for his good behavior for one year from this day, and that he be remanded to jail, there to remain until such recognizance be entered into."

This case is relied upon as a decision to show, that although this court cannot, as was held in Metzger's case, issue a writ of *habeas corpus* to examine the validity of the warrant of the Commissioner; yet, if the Circuit Court has, by such a writ, examined its validity, pronounced it valid, and therefore dismissed the writ, and ordered the prisoner to be continued in the custody of the marshal, this court may, upon a writ of *habeas corpus*, examine that decision, and reverse it, if found erroneous.

Before considering whether the decision in Burford's case goes this length, I think it consistent with the profoundest respect for the very eminent judges who sat in that case, to say, that it does not appear that the question now made, was by them examined and considered, or that they themselves would have deemed it foreclosed by that decision. Indeed, that they would not have so considered, seems to me from the fact that, at the term of the court following this decision, when a writ of *habeas corpus* was moved for, to bring up the body of James Alexander, Marshall, C. J., said:—" The whole subject will be taken up *de novo*, without reference to precedents. It is the wish of this court to have the motion made in a more solemn manner to-morrow, when you may come prepared to take up

the whole ground." 4 Cr. 75, note. Further proceedings upon this motion became unnecessary, in consequence of the discharge of the prisoner by another tribunal; but a few days after, upon motions in behalf of Bollman and Swartwout, committed by the Circuit Court under a charge of treason, the court proceeded to hear arguments upon its jurisdiction to issue the writs, and in an elaborate judgment affirmed the jurisdiction to examine a cause of commitment by the Circuit Court. I cannot doubt, therefore, that if at that time the further question had arisen whether the court had also jurisdiction to examine a cause of commitment by a Commissioner, after the Circuit Court had reviewed that cause, and pronounced it sufficient, the court would have thought it necessary to consider that question also *de novo*, upon all its grounds, and would not have treated Burford's case as a sufficient basis on which to rest their decision. But, as I understand Burford's case, it is clearly distinguishable from the case at bar. The Circuit Court, in that case, did not dismiss the writ of *habeas corpus;* they made an order under it, to imprison Burford. That order was, that he be remanded to jail, there to remain until he should enter into a recognizance, with surety, in the sum of $1000, for his good behavior for one year. This order was the cause of commitment, and under this order he was held when the writ of *habeas corpus* issued from this court. It necessarily superseded the order made by the justices of the peace, which was, that Burford should be imprisoned until he should recognize in the sum of $4000, with surety, to be of good behavior indefinitely.

It is true the Circuit Court did not proceed *de novo*, and that for this reason their order was held invalid. But the question of jurisdiction did not depend upon the validity of the order, or the causes of its invalidity, but simply upon the fact that the Circuit Court caused the commitment; and when it issued an order, complete in itself, that Burford should be imprisoned, and by that order superseded the former order of the Justices, the Circuit Court did an act which caused his commitment, and this court might inquire, by a writ of *habeas corpus*, into its validity. The distinction between such a case, and one where the Circuit Court merely dismissed the writ of *habeas corpus*, is to my mind clear.

And it must be observed that the question now is, not whether this court treated the act of the Circuit Court as the cause of commitment. I have no doubt they did so treat it, and it seems to have been so considered in subsequent cases. In Ex parte Watkins, (7 Peters, 573,) Mr. Justice Story, in reviewing the cases on the subject of *habeas corpus*, says:—" In Ex parte Burford, the prisoner was in custody under a commitment by the

11*

Circuit Court, for want of giving a recognizance for his good behavior, as awarded by the court." So in Metzger's case, (5 How. 189,) Mr. Justice McLean says :—" Ex parte Burford was a *habeas corpus*, on which the prisoner, who had been committed by the Circuit Court in this district, was discharged, there being no sufficient cause for the commitment."

It is undoubtedly true, that the imprisonment of Burford was considered to be under a commitment by the Circuit Court, and the case is an authority to prove that when a writ of *habeas corpus* is returned in the Circuit Court, and that court makes an order imprisoning the party, this court may review that order. But it is not, in my judgment, an authority to show that the Circuit Court of the Southern District of New York did make an order imprisoning Kaine. In Burford's case, the court did not dismiss the writ, nor refuse to discharge the prisoner from the commitment by the Justices, but made an order which constituted a new cause of commitment, and superseded the existing cause. In Kaine's case, the Circuit Court held the existing cause to be sufficient, and refused to interfere with it. In my judgment, these cases are not parallel.

Nor do I consider the case Ex parte Watkins, (7 Pet. 572,) to be an authority that jurisdiction exists in this case. It is only necessary to quote a single passage, from the opinion of the court, to show that it cannot aid in solving the question which I am now considering. " The award of the *capias ad satisfaciendum*, must be considered as the act of the Circuit Court, it being judicial process issuing under the authority of the court. The party is in custody under that process. He is then in custody in contemplation of law, under the award of process by the court."

It is upon this ground the decision is rested, and I can find nothing in it tending to show that in the case at bar the act of the Circuit Court is the cause of commitment.

I shall not particularly examine the other decisions of this court, which are still more remote from the case at bar.

My opinion is, that the cause of commitment of Kaine is not the act of the Circuit Court, but of the Commissioner; and for this reason the writ must be refused.

But there is another ground, on which this refusal may be rested. The decision of the Circuit Court was made on the 9th day of July. On the 17th day of July, a warrant was issued from the Department of State, which was in the following words:

·DEPARTMENT OF STATE, Washington, July.17th, 1852. *To all whom these presents shall come, greeting:—*

Whereas, John F. Crampton, Envoy Extraordinary and

Minister Plenipotentiary to Her Majesty the Queen of Great Britain and Ireland, hath made requisition, in conformity with the 10th article of the treaty between the United States and Great Britain, for the mutual surrender of fugitive criminals, concluded at Washington, the 9th day of August, 1842, for the delivery up to justice of Thomas Kaine, charged with the crime of assault with an intent to commit murder, in the county of Westmeath, Ireland.

And whereas, the said Thomas Kaine hath been found in the State of New York, within the jurisdiction of the United States, and has, by proper affidavit, and in due form, been brought before Joseph Bridgham, a Commissioner duly appointed by the United States Circuit Court for the Southern District of New York, in the second circuit, for examination of said charge of assault with intent to commit murder. And whereas, the said Commissioner hath deemed the evidence sufficient to authorize the commitment of said Thomas. Kaine, and has, accordingly, committed him. All of which appears by a copy of the proceedings transmitted to this department.

Now, these presents are to require of the United States Marshal for the Southern District of New York, or of any other public officer or person having charge or custody of said Thomas Kaine, to surrender and deliver him up to Anthony Barclay, Her Britannic Majesty's Consul at the Port of New York, or to any other person or persons duly authorized to receive said fugitive, and conduct him to Great Britain for trial.

In testimony whereof, I have hereunto signed my name, and caused the seal of this Department to be affixed, at Washington, this 17th day of July, A. D. 1852, and of the independence of the United States the seventy-seventh.

[SEAL.]       Signed,          W. HUNTER,

*Acting Secretary of State.*

Upon its face, this warrant is perfectly regular. Its recitals set forth every fact necessary to warrant the act of extradition, according to the treaty and the act of Congress. It appears, by the return of the marshal upon the writ issued by Mr. Justice Nelson, that before he received that writ, this warrant had come to his hands, and he had, in obedience to it, tendered Kaine to Anthony Barclay, who expressed his readiness to receive him; and while arrangements were about to be made to put Kaine on shipboard, the writ of *habeas corpus,* issued by Mr. Justice Nelson, suspended the further execution of the warrant of extradition.

This warrant of extradition is the final process under the treaty and act of Congress. When it comes to the hands of

the marshal, he holds the prisoner for the purpose of executing it. Upon this process, therefore, Kaine is now held.

The act of Congress requires the Judge, or Commissioner, to certify to the Secretary of State his finding, together with a copy of all the testimony taken before him, that a warrant may issue upon the requisition of the proper authorities of the foreign government for the surrender of the fugitive, according to the stipulations of the treaty. Such a warrant having issued, and its validity not having been considered by any court of original jurisdiction, in my judgment it is not the exercise of an appellate power to examine its validity by a writ of *habeas corpus*. It may be true that, if the proceedings before the Commissioner were to be held void, this warrant must also be invalid. But the question is not, whether this warrant is valid, but whether we have jurisdiction to examine its validity. It may also be true that, if this warrant were final process, issued by the Circuit Court, and we had power to examine the legality of a judgment or order of that court, pursuant to which it issued, we should also have jurisdiction upon a *habeas corpus*, to examine the validity of such a warrant, and of the proceedings of executive officers under it. But this warrant did not emanate from the Circuit Court, nor does it depend, in any way, upon its authority, nor is it a legal consequence of the action of the Circuit Court on the writ of *habeas corpus*, or in any other proceeding. It emanates from a department of the executive, which rests its action upon the proceedings of the Commissioner, and over neither can this court have, under the Constitution, nor has it under the laws, any appellate jurisdiction or control. Marbury *v.* Madison, 1 Cr. 137.

For the reason, then, that if a writ of *habeas corpus* were allowed in this case, the validity of the warrant of extradition could not be examined here, I think the writ should be refused.

In considering the question, whether the Supreme Court of the United States has jurisdiction, under the Constitution and laws of the United States, to entertain this application, I have not felt at liberty to allow my judgment to be pressed upon by the great value of the particular writ applied for, or the propriety and expediency of a power in this court to review the judgments of the Circuit Courts, in cases affecting the liberty of the citizen. To all that has been said concerning the preeminent utility of the writ of *habeas corpus*, I readily assent. But it must be remembered, that the real question here is not, whether this great writ shall be freely and efficiently used, but whether our appellate power is large enough to extend to this case. The Circuit Court has power, upon its own views of the law, to inflict, not only imprisonment, but even the punishment

of death, without appellate control by this court. Even when it is alleged, that the proceedings of a circuit court, by which a citizen is imprisoned, are *coram non judice* and void, its judgment is final, and no relief can be had here, by writ of error or appeal, or by *habeas corpus*. Ex parte Watkins, 3 Pet. 193; Ex parte Kearney, 7 Wheat. 38.

Undoubtedly, it would be competent for Congress to do, in cases like this, what it has done in a class of cases somewhat analogous. By the act of August 29, 1842, (5 Stat. at Large, 539,) when the subject of a foreign government is imprisoned for an act done under the authority of that government, and a writ of *habeas corpus* is issued by a Judge of this court, or by a District Judge, an appeal to the Circuit Court, and from its order to this court, is expressly given.

It is for Congress to determine, whether this class of cases requires the same privileges. Until it so determines, I must give my decision upon our jurisdiction, as, according to my judgment, it exists, unaffected by the consideration, that it might be expedient to enlarge it. My opinion is that, if the writ prayed for were issued, we should not have jurisdiction to inquire into the cause of commitment shown by the petition, and consequently the writ should be refused. I give no opinion upon the sufficiency of the cause of the commitment, not deeming it to be judicially before us.

Mr. Justice NELSON.

The application for the arrest and delivery of Thomas Kaine was originally made on the requisition of the British Consul, resident at the port of New York, before Joseph Bridgham, Esq., a United States Commissioner for the Southern District of New York. A warrant was issued and the arrest made, and, on the return before this officer, an examination took place upon a charge that the fugitive had committed an assault, with intent to murder, upon one James Balfe, in Ireland, on the 5th April, 1851. The Commissioner, upon hearing the allegation and proofs, adjudged the prisoner guilty, and ordered that he be committed, in pursuance of the treaty, to abide the order of the President of the United States. A petition was then presented to the Circuit Court for the Southern District of New York, holden by the District Judge, for a writ of *habeas corpus*, directed to the marshal, to bring up the body of the prisoner; and also a *certiorari* to the Commissioner, to bring up the proceedings that had taken place before him; and upon a full review of all these proceedings, on the 9th July, 1852, adjudged that the commitment and detention were for sufficient cause, and ordered that the writ of *habeas corpus* be dismissed, and the prisoner be

remanded, and continued in the custody of the marshal, under said commitment. On the 17th July, copies of these proceedings having been forwarded to the Department of State, at Washington, the Acting Secretary issued his warrant to the marshal having the custody of the prisoner, directing that he be surrendered to Mr. Barclay, the British Consul, or to any other person or persons duly authorized to receive the fugitive and transport him to Great Britain for trial. On the 22d July, a petition was presented to me, at my chambers, in Cooperstown, on behalf of the prisoner, for a writ of *habeas corpus*, which I declined allowing until the whole of the proceedings that had already taken place in the matter were laid before me. Copies of them were subsequently furnished, and, upon an examination, being satisfied that the Commissioner had no jurisdiction over the case, I allowed the writ, on the 3d of August, returnable before me, at my chambers, on the 11th of the same month, and which return was made accordingly. As the case was one in which I entertained a different opinion from that of the tribunals before whom the proceedings had taken place, not only as to the jurisdiction of the Commissioner, but also in respect to their interpretation of the treaty, and act of Congress passed to carry it into effect; and, as the questions involved were of considerable interest of themselves, and concerned deeply the two nations who were parties to the treaty, on the return to the writ I entered an order, directing that the case be heard before all the Judges, at the commencement of the next term of this court. The case has now been heard in full bench, and I am inclined to concur with my brethren, that we cannot entertain jurisdiction of it upon my allowance of the writ and adjournment of the proceedings to be heard in this court. The practice is a familiar one, in the proceedings under this writ, before the King's Bench, in England. 1 Burr. R. 460, 542, 606; Comyn's Digest, *Habeas Corpus*, 3d ed.; Bl. Com. 131; 9 Ad. & Ell. 731, Leonard Watson's case, and which furnished the precedent for that adopted by me in this case. That, however, is an original proceeding; and, in cases where the court has original jurisdiction to hear and determine the matters upon the return, and where the hearing may be had either before one of the Justices, at chambers, or in full bench. But, according to the settled course of decisions in this court, we can only issue the writ, and entertain jurisdiction of the matters set forth on the return, in the exercise of our appellate power. United States v. Hamilton, 3 Dall. 17; Ex parte Burford, 3 Cr. 448; Ex parte Bollman and Swartwout, 4 Id.; Ex parte Kearney, 7 Wheat. 38; Ex parte Watkins, 3 Pet. 193; 7 Id. 568; Ex parte Metzger, 5 How. 189. And, as the power cannot be exercised by one of the

Justices, at chambers, there may be ground for a distinction between the proceedings, under the writ, in this court and in the King's Bench. The issuing of the writ, and proceedings before me, at chambers, under it, must undoubtedly be regarded as an original proceeding, and not in the exercise of an appellate power. If this conclusion be a sound one, the remedy for the defect in the law must be sought in Congress, who can make provision for the issuing of the writ in vacation as well as in term, in all cases where this court possesses jurisdiction to entertain proceedings under it. The right of the citizen to appeal to the court for the benefit of this great writ, in case of an illegal restraint of his liberty, ought not to be restricted to the time of its sitting; but, as in all other cases where its jurisdiction may be exercised, provision should be made for instituting the proceeding in vacation. The prisoner has now presented to this court a petition, praying for a writ of *habeas corpus* to be directed to the marshal, that he may be brought up, together with the ground of his commitment; and, also, for a *certiorari* to the Circuit Court, to bring up the proceedings that have taken place in that court, which disembarrasses the case of all exceptions to the form of the application; and the return of the marshal and the proceedings before the Circuit Court being now before us, on this preliminary motion, by the agreement of the counsel, the case is in a situation to enable us to express an opinion upon the merits. It is objected, that this court cannot entertain jurisdiction of the case, even upon the petition, return of the marshal, and of the proceedings before the Circuit Court to the *certiorari*, for the reason, it appears, as supposed, that the prisoner is held in confinement under the warrant of the Commissioner, and not under the decision and order of the Circuit Court; that this court cannot reach and review the proceedings before the Commisioner, by virtue of this writ, in the exercise of its appellate power, but can only reach and review the proceedings and order of the Circuit Court; and, as the confinement of the prisoner is not under or in pursuance of the order of that court, the proceedings under the writ here would be a nullity. The first case in which this question was discussed at large by counsel and by the court, was that of Ex parte Bollman and Swartwout. They were in confinement in this district, under a warrant from the Circuit Court, upon a charge of treason against the United States. Two objections were taken to the power of this court to issue the writ to bring up the prisoners: 1st, that it involved the exercise of an original jurisdiction, not given by the Constitution; and, 2d, that, if it was the exercise of an appellate power, it was not within the 14th section of the Judiciary Act,

which alone conferred the authority to issue this writ. Chief Justice Marshall, who delivered the opinion in that case, admitted the power could not be exercised as a part of the original jurisdiction of the court; but held, that it possessed jurisdiction, as an appellate power, under this 14th section. After answering the argument, that the power to award the writ was limited by that section to causes pending in this court, in which it was necessary, in order to enable it to make a final decision in the case, he observed that the proviso to the section extended to the whole of it ; that proviso is as follows :

That writs of *habeas corpus* shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify.

And that, construing the section with reference to this proviso, the power of the court to issue the writ extended to all cases where the prisoner was restrained of his liberty, under the authority of the federal government. The same principle is derived from that section, as stated by Mr. Justice McLean in Ex parte Dorr, 3 How. 103–105. " The power given to the courts," he observes, "in this section to issue writs of *scire facias, habeas corpus*, &c.; as regards the writ of *habeas corpus*, is restricted by the proviso to cases where a prisoner is in custody under or by color of the authority of the United States, or has been committed for trial before some court of the same, or is necessary to be brought into court to testify. This is so clear," he observes, "from the language of the section, that any illustration of it would seem to be unnecessary. The words of the proviso are unambiguous. They admit of but one construction." If this construction of the section is to be maintained, (and the case Ex parte Bollman and Swartwout was very fully and deliberately considered,) then it is manifest the power to issue this great writ for the security of the liberty of the citizen, is much broader than has been contended for on behalf of the prisoner in the case before us. Hamilton's case, decided in 1795, led the way to the decision in Bollman and Swartwout. That case repudiates the idea, that the power to issue the writ is limited to instances where the proceeding is ancillary to the determination of a suit pending. Hamilton was in jail on a warrant issued by the District Judge, at chambers, upon a charge of treason. Chief Justice Marshall, in Ex parte Tobias Watkins, (3 Peters, 208,) observes that in the case of Bollman and Swartwout, the *habeas corpus* was awarded on the same principle on which it was awarded in Hamilton's case ; and, in Ex parte Kearney, Mr. Justice Story, in stating the points in the case, observes, " the first is whether or not

this court has authority to issue a *habeas corpus* where a person
is in jail under the warrant or order of any other court of the
United States." And then says, "that it is unnecessary to
say more than that the point has already passed in *rem judicatam*
in this court. In the case of Bollman and Swartwout, it was ex-
pressly decided, upon full argument, that this court possessed
such authority, and the question has ever since been considered
at rest." In the case of Ex parte Watkins, reported in 7 Peters,
568, there is a still stronger exercise of the power to issue this
writ. In that case the prisoner was in custody of the marshal
under three executions regularly issued out of the Circuit Court,
but their efficacy had expired by the neglect of the marshal to
bring in the body on the return day. The error or wrongful
detention lay wholly with the marshal, and yet this court issued
the *habeas corpus*, and discharged the prisoner. The case stands
upon the principle decided in Hamilton's case, and in Bollman
and Swartwout, that the writ may issue in all cases where the
prisoner is in custody under and by color of the authority of the
United States. In the case Ex parte Metzger, the prisoner was
committed to the custody of the marshal by the District Judge,
at his chambers, under the French treaty of extradition. This
court held that they possessed no power to issue the writ of
*habeas corpus*, inasmuch as the order of commitment had been
made at chambers and not in court. This case undoubtedly
stands alone, and has very much narrowed the power of the
court in issuing this great writ in favor of the liberty of the
citizen, from that repeatedly asserted in previous cases. But I
do not propose to disturb it. For the case before us is within
the doctrine of this case, and of every other that has heretofore
been passed upon by the court, as I shall proceed briefly to
show. The *habeas corpus*, which was issued in the case before
us, by the court below, to the marshal, brought up the body of
the prisoner, and also the warrant of commitment, into that
court, and the *certiorari* to the Commissioner brought up the
record, or tenor of the record of the proceedings before him,
upon which the warrant had issued. The whole case, therefore,
was in that court. And pending the examination or hearing,
the prisoner, in all cases, on the return of the writ, is detained,
not on the original warrant, but under the authority of the writ
of *habeas corpus*. He may be bailed on the return *de die in
diem*, or be remanded to the same jail whence he came, or to
any other place of safe keeping under the control of the court,
or officer issuing the writ, and by its order brought up from time
to time, till the court or officer determines whether it is proper
to discharge or remand him absolutely. The King's Bench may,
pending the hearing, remand to the same prison or to their own,

the Marshalsea. The efficacy of the original commitment is superseded by this writ while the proceedings under it are pending, and the safe keeping of the prisoner is entirely under the authority and direction of the court issuing it, or to which the return is made. Bacon, title *Habeas Corpus*, B. 12; 5 Mod. 22, The King *v.* Bethel; Comyn, title *Habeas Corpus*; 1 Vent. 330, 346; 3 East, 156; 1 B. & Cr. 358; 4 B. & A. 295. Holt, Chief Justice, observed, in the King *v.* Bethel, when a man comes in by *habeas corpus*, by the power of the court, he may be bailed to appear *de die in diem*, till the case is determined, and then he may be remanded to the same prison. " By the petition of right," he again remarks, " we are to bail or discharge in three days, but when we bail (that is, *de die in diem*) and afterwards remand him, it is no escape, for the entry is '*remittitur*,' and that is a commitment grounded on the old one."

The Circuit Court, in the case before us, after reviewing the proceedings on the return of the writ, and also to the *certiorari*, arrived at the conclusion that they were regular and legal; and, to use its own words, —

" Accordingly adjudges that the commitment and imprisonment of the prisoner, for the causes in the return to the *habeas corpus*, in the case set forth, are sufficient cause and warrant in law for his detention by the marshal. Therefore, it is ordered by the court that· the writ, &c., be dismissed, and that the prisoner be remanded, and continued in the custody of the marshal, under such his arrest and commitment by the aforesaid process," meaning the original warrant of the Commissioner.

The question here is, whether, upon the law governing the writ of *habeas corpus*, and to which I have referred, and upon this judgment of the court, the prisoner is or is not held in confinement under the order of the Circuit Court. If he is, it is admitted by all that this court has jurisdiction of the case, and is bound to revise that decision. That court not only adjudges the commitment and imprisonment lawful, but directs the prisoner to be remanded, which, says Holt, Chief Justice, is a commitment grounded on the old one; and, further, (which was superfluous,) the order directs that he shall be continued in the custody of the marshal, under the old commitment. How it can be said, in view of the law governing this writ, and of the form of the judgment of the court below, that the prisoner is not in confinement under that judgment, but simply under the process of the Commissioner, without dependence upon that judgment, I admit I am incapable of comprehending. But if any further authority is wanting upon this question, I will refer to an early case in this court, Ex parte Burford, 3 Cranch, 448. That was a commitment by magistrates in this district. The

## In re Kaine.

case was reviewed on writ of *habeas corpus* by the Circuit Court, and the prisoner remanded; afterwards, a writ, issued from this court, bringing up the prisoner, and also th proceedings which were before the court below. This court discharged the prisoner, saying that the warrant of commitment by the magistrates was illegal, for not stating the cause of commitment—that the Circuit Court had revised the proceedings and corrected two of the errors of the magistrates and left the rest. The case, in principle, is not distinguishable from the one before us. Here the Circuit Court has corrected none of the errors of the Commissioner, if any, but confirmed all of them, and recommitted the prisoner to the custody of the marshal. It has been argued that great inconvenience would arise, if the writ of *habeas corpus* could issue from this court into any part of the Union to bring up a prisoner on a petition that he was illegally restrained of his liberty under the authority of the United States, as the proceeding must be attended with delay and expense, by reason of the great extent of our territory. But, it must be remembered that, in the case of a right of property involved, dependent upon the laws of the Union, and a decision against it, the party against whom a decision has been made in a State court, however small the amount in controversy, is entitled to a writ of error to this court, to bring up the case for review, by the 25th section of the same act in which this 14th section is found. And I am yet to learn that the right of the liberty of the citizen is not as dear to him, and entitled to be guarded with equal care by the Constitution and laws, as the right of property, notwithstanding the supposed inconvenience. Such has heretofore been, as we have seen, the opinion in this court, when dealing with the writ in question; and I will simply add, in the language of Chief Justice Denman, in the case of the Canadian prisoners, "that it seems to me that we would be tampering with this great remedy of the subject, the writ of *habeas corpus*, if we did not say that we would abide by the practice we find, and deal with this as it has been formerly dealt with." I am satisfied, therefore, that this court has jurisdiction to issue the writ of *habeas corpus*, to inquire into the legality of the commitment below; and, as the whole case is before us on this motion, by the stipulations of the parties, shall proceed to an examination of the questions raised upon the merits.

It may, I think, be assumed, at this day, as an undoubted principle of this government, that its judicial tribunals possess no power to arrest, and surrender to a foreign country, fugitives from justice, except as authorized by treaty stipulations, and acts of Congress passed in pursuance thereof. Whether Congress could confer the power independently of a

treaty, is a question not necessarily involved in this case, and need not be examined. If it was, as at present advised, I am free to say that I have found no such power in any article or clause of the Constitution, delegated to that body by the people of the States. It belongs to the treaty-making power, and to that alone, and its exercise is dependent upon the executive department, with the concurrence of two thirds of the Senators, and such I think has been the practical construction given to the Constitution since the foundation of the government. We must look, therefore, to the provisions of the treaty with Great Britain, and the act of Congress passed in pursuance thereof, for the authority to be exercised by the judiciary in the surrender of the alleged fugitive in question, and by these provisions and act, ascertain and determine whether or not the proceedings in the tribunals below, who have ordered a surrender, are in conformity with them, and warranted by law. By the treaty, " it is agreed, that the United States and Her Britannic Majesty, shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice, all persons who, being charged with the crime of murder," &c.; " and the respective judges and other magistrates of the two governments shall have power, jurisdiction, and authority, upon complaint, made under oath, to issue a warrant for the apprehension of the fugitive," &c.

In the case before us, Her Britannic Majesty's Consul at the port of New York made a requisition and complaint, before one of the United States Commissioners, against the fugitive in question — upon which, a warrant was issued and the arrest made, and, after an examination into the charge, committed, for the purpose of being surrendered. No demand was made upon this government, by the government of Great Britain, claiming the surrender. This government was passed by, and the requisition made by the Consul, directly upon the magistrate, on the ground, as contended for, namely, that the consent or authority of the Executive is unnecessary to warrant the institution of the proceedings; and, in support of their propriety and regularity, the position is broadly taken, and without which the proceedings cannot be upheld, that, according to the true interpretation of the treaty, any officer of Great Britain, however inferior, properly represents the sovereign of that country, who may choose to prosecute the alleged fugitive in making the requisition, and is entitled to the obedience of the judicial tribunals for that purpose, and if sufficient evidence is produced before them, to arrest and commit, that a surrender may be made; and, that in this respect, such officer is put on the footing of any of the prosecuting officers of this government, who are

authorized to institute criminal proceedings for a violation of its laws; that the country is open to him, throughout the limits of the Union, and the judicial tribunals bound to obedience on his requisition and proofs, to make the arrest and commitment. This is the argument. Now, upon recurring to the terms of the treaty it will be seen, I think, that no such stipulations were entered into, or intended to be entered into, by either government, or any authority conferred to justify such a proceeding. The two nations agree, that upon "mutual requisition by them, or their officers or authorities respectively made" — that is, on a requisition made by the one government, or by its ministers or officers properly authorized, upon the other — the government, upon whom the demand is thus made, shall deliver up to justice all persons charged with the crimes, as provided in the treaty. who shall have sought an asylum within her territories. In other words, on a demand, made by the authority of Great Britain upon this government, it shall deliver up the fugitive; and so in respect to a demand by the authority of this government upon her. This is the exact stipulation entered into, when plainly interpreted. It is a compact between the two nations in respect to a matter of national concern — the punishment of criminal offenders against their laws — and where the guilty party could be tried and punished only within the jurisdiction whose laws have been violated. The duty or obligation entered into, is the duty or obligation of the respective nations, and each is bound to see that it is fulfilled, and each is responsible to the other in case of a violation. When the *casus fœderis* occurs, the requisition or demand must be made by the one nation upon the other. And upon our system of government, a demand upon the nation must be made upon the President, who has charge of all its foreign relations, and with whom only foreign governments are authorized, or even permitted, to hold any communication of a national concern. He alone is authorized, by the Constitution, to negotiate with foreign governments, and enter into treaty obligations binding upon the nation; and, in respect to all questions arising out of these obligations, or relating to our foreign relations, in which other governments are interested, application must be made to him. A requisition or demand, therefore, upon this government, must, under any treaty stipulation, be made upon the Executive, and cannot be made through any other department, or in any other way. Judge Marshall, in his celebrated argument in the case of Jonathan Robbins, who was demanded by Great Britain, under the treaty of 1795, and from which this part of the treaty of 1842, was taken almost *verbatim*, speaking of the requisition in that case, observes:

12 *

" That the case was, in its nature, a national demand, made upon the nation. The parties were the two nations. They cannot come into court to litigate their claims, nor can a court decide on them. Of consequence, the demand is not a case of judicial cognizance." He further observes, that "the President is the sole organ of the nation, in its external relations, and its sole representative with foreign nations. Of consequence, the demand of a foreign nation can only be made on him." Again, he says: "The department, which is intrusted with the whole foreign intercourse of the nation, with the negotiations of all treaties, with the power of demanding a reciprocal performance of the article, which is accountable to the nation for the violation of its engagements with foreign nations, and for the consequences resulting from such violation, seems the proper department to be intrusted with the execution of a national contract, like that under consideration."

The idea of a requisition of a foreign nation upon the judiciary of another, much more upon the humble magistrate of another, demanding, as of right, the fulfilment of treaty obligations, is certainly novel, and one that I would not willingly attribute to the distinguished men who negotiated this one, nor to the governments that ratified it. So extraordinary an interpretation ought not to be given to the instrument, unless upon the plainest and most imperative terms. It does great injustice to both nations. The proceedings, consequent upon it, compromit the character and dignity of the one making the demand, and are disrespectful to the other, and may be dangerous to the liberty of the citizen. The record before us shows, that a requisition, with due solemnity, was made upon the Commissioner, in this case, by Her Britannic Majesty's government, through her Consul, and seems to imply, that the magistrate is to act under the power and authority of that government, rather than in obedience to the laws of his own; and that a refusal to act would be a contempt of that authority, and of the *casus fœderis* of a treaty obligation. If any further argument was wanting for the interpretation of the treaty for which I am contending, I might refer to that given by the authority of Great Britain, in providing by act of Parliament for carrying it into execution on her part.

By the 6th and 7th Victoria, chapter 76, it is enacted, " That, in case a requisition shall at any time be made by the authority of the United States, in pursuance of, and according to the said treaty, for the delivery of any person charged with the crime of murder, &c., it shall be lawful for one of Her Majesty's principal Secretaries of State, or, in Ireland, for the Chief Secretary of the Lord-Lieutenant of Ireland, and in any

of Her Majesty's colonies or possessions abroad, for the officer administering the government of any such colony or possession, by warrant under his hand and seal, to signify that such requisition has been so made, and to require all justices of the peace, and magistrates and officers of justice, within the several jurisdictions, to govern themselves accordingly, &c.; and thereupon it shall be lawful for any justice of the peace, &c.; to examine upon oath any person or persons, touching the charge," &c.

Now, it will be seen that, according to the interpretation given to the treaty by Great Britain, the requisition for the delivery of the fugitive must be made by the President upon that government, and its warrant obtained, before any magistrate within her dominion is authorized to act in the matter. The act of Parliament deals with the treaty as regulating a matter of national concern, and in respect to which both nations must act in carrying into execution its stipulations; and it is only after both have acted, and an authority obtained for the surrender, that the power of the judiciary can be called into requisition. I am satisfied this is a sound interpretation of its provisions, and is one, while it secures the punishment of the offender, guards the citizens and subjects of the respective countries against any abuse of the power. While its exercise is thus kept under the supervision and control of the two governments, there can be no danger of its being perverted, to the purposes of private malice and revenge, which might justly be apprehended, if left to the unrestrained discretion of the subordinate officers of either. The construction, against which I am contending, would refer the execution of the treaty to the subordinate and inferior agents of both governments, so far as the surrender of the fugitive, on our part, is concerned; for, as I understand that construction, any subordinate officer of Great Britain may make the requisition directly upon the magistrate, for the apprehension and committal; and, upon such committment being communicated to the government, the Secretary of State issues his warrant that the prisoner be delivered to the British authorities. And, as I am advised, that department decided, in the case before us, that the government would not go behind the decision of the Commissioner, adjudging the prisoner guilty. Thus, the whole of the proceeding in the exercise of this high and delicate power, if the requisition of the President, in the first place, is dispensed with, would pass out of the hands and beyond the control of the government. This seems to be the result of the American interpretation of the treaty, sought to be established. It has been argued that, in Metzger's case, in which demand was made by the French government, under the treaty of November 9, 1843, the Execu-

tive declined to act until an application had been made to the judiciary, and that this construction was sanctioned by the court in that case. The treaty, in express terms, requires the requisition to be made through the diplomatic agents of the respective governments; but that the surrender shall not be made until the crime is established according to the laws of the country in which the fugitive is found. In that case, the requisition was made upon the Executive by the diplomatic agent of France, who was referred to the judiciary. The application to the judiciary, therefore, was with the approbation of this government. How formal it was given, does not appear in the case. The same practice was adopted by the Executive, in the case of Jonathan Robbins. There, on the requisition made by Great Britain upon the President, he referred the case to a Judge of the District Court of the United States, to inquire into the facts and determine whether or not he was guilty of the offence charged against him. And it is upon this construction, given to the treaty of 1795, upon which all our subsequent treaties of extradition seem to have been drafted. The power to surrender is not confided exclusively to the Executive under the treaty in question, nor was it under the treaty of 1795. On the requisition being made, if the President is satisfied, upon the evidence accompanying it, that a proper case is presented for an inquiry into the crime charged, the authorities claiming the fugitive are referred to the judiciary; and then, it is the duty of the courts or judges to act and to take the proper steps for the arrest and inquiry. The Executive alone possesses no authority, under the Constitution and laws, to deliver up to a foreign power any person found within the States of this Union, without the intervention of the judiciary. The surrender is founded upon an alleged crime, and the judiciary is the the appropriate tribunal to enquire into the charge. It has also been urged that great inconvenience may exist in the pursuit and apprehension of fugitives upon the construction contended for, in consequence of the extended frontier line between the two countries, as much time will be consumed in making the requisition upon the President. This may be so; but I cannot agree that a sound construction of the treaty, and one which affords nothing more than a just protection to the personal liberty of the citizen against the abuse of power, shall be made to yield to the suggestions of convenience; for, although the prisoner before us may be a foreigner, and even may be a fit subject to be given up to the subordinate and irresponsible agents of the government claiming him, still, it is not to be denied that the same power, thus attempted to be exercised by them, in this instance, is equally applicable to any citizen of

the country, upon a like complaint; and besides, under our
system of laws and principles of government, so far as respects
personal security and personal freedom, I know of no distinc-
tion between the citizen and the alien who has sought an asylum
under them.    I will simply add, that, according to the act of 6th
and 7th Victoria, already referred to, carrying into effect this
treaty, the indulgence of any such convenience in its execution,
is regarded as too dangerous to the subjects of that government
residing within its dominions, on the other side of this extended
boundary.    The treaty, after providing for the requisition of the
one government upon the other, for the surrender, then provides
that the respective judges and other magistrates of the two
governments shall have power, jurisdiction, and authority, upon
complaint made under oath, to issue a warrant for the appre-
hension of the fugitive.    After the requisition has been made
upon the President, the organ of the government as regards our
foreign relations, and his authority obtained, the means are thus
provided for procuring the surrender.    An application is then
made to the judiciary of the country, not upon the requisition
of the foreign government, but, as in all other cases, upon the
authority of its own — and the warrant issued in pursuance of
such application, runs in the name of the President of the
United States.    The act of Congress, passed to carry our treaties
of extradition into effect, and of course this one among others,
takes up the subject at this stage of the proceedings, and desig-
nates the judicial officers who are authorized to act, and pre-
scribes, in general terms, the steps to be pursued in the arrest, the
examination of the criminal charge, and final commitment for
the surrender, if evidence of the criminality is found sufficient.
There is no necessary discrepancy between the provisions of
this act and the treaty, as the requisition of the one govern-
ment upon the other is not attempted to be regulated or defined,
but is left as regulated by the terms of that instrument.    The
provisions of the treaty must, therefore, be resorted to for the
purpose of ascertaining how that requisition shall be made.    I
have already explained my interpretation of them, and need not
repeat it.    The judicial officers designated in the treaty, and
upon whom jurisdiction is conferred, are " the respective judges
and other magistrates of the two governments."    The act of
Congress, in carrying out this provision, designates the Justices
of the Supreme Court, the Judges of the several District Courts
of the United States, the Judges of the several State Courts,
and Commissioners specially authorized so to do, by any of the
courts of the United States.    The terms " other magistrates of
the two governments," are quite indefinite and difficult in their
application by judicial construction.    In an enlarged sense,

they might embrace all the United States Commissioners appointed by the Circuit Court, who, under the act of Congress of the 23d of August, 1842, are authorized to arrest persons for crimes against the United States, and imprison or bail the same; and, also, all the justices of the peace of the several States, upon whom like power is conferred by the 33d section of the Judiciary Act of 1789. I can hardly suppose that the distinguished citizen who represented this government in the negotiation of the treaty, or the President, under whose supervision it was entered into, contemplated the exercise of so high and delicate a power over the rights and liberty of the citizen, by so numerous a body of the magistracy of the country. But, be this as it may, Congress, in providing for the execution of the treaty, has declared who shall constitute those " other magistrates," before whom the application may be made for the arrest and examination, and have confined the jurisdiction, in this respect, to the Judges of the several State courts, and Commissioners specially authorized by the courts of the United States, for the performance of that duty. The provision necessarily excludes the great body of the State magistrates and of United States Commissioners, possessing general power to arrest and commit for offences against the United States, and is in no respect in conflict with any clause in the treaty, but in harmony with it, and in furtherance of a proper and discreet execution of its stipulations.

It has been argued that, admitting the State magistrates to possess no power under the act of Congress passed to carry the treaty into effect, yet that act confers the power upon the body of United States Commissioners, authorized to arrest and commit for crimes against the United States, under the act of 1842. A slight attention to the provisions of the act, I think, will refute any such conclusion. The 1st section confers the exercise of the power under the treaty, upon the Judges of the Federal courts, and of the State courts, and upon " Commissioners authorized so to do by any of the courts of the United States;" and the 6th section provides—" That it shall be lawful for the courts of the United States, or any of them, to authorize any person or persons to act as a Commissioner or Commissioners under the provisions of this act; and the doings of such person or persons so authorized in pursuance of any of the provisions aforesaid, shall be good and available to all intents and purposes whatever."

Taking these two provisions together, and construing them as part of a regulation prescribed by law for carrying the treaty into effect, I think it plain that a Commissioner, competent to act in the matter, must be specially appointed, or authorized by

the Federal courts for that purpose. The first section confines the exercise of the power to Commissioners thus specially authorized to perform this duty; and the sixth provides for the appointment of them, and declares that their doings in the premises, in conformity with law, shall be good and valid. How it can be said that the exercise of a power thus guarded and restricted, both in the grant and in the appointment, is conferred, also, upon a body of officers appointed under a different act, and for other special and limited duties, I admit is beyond my comprehension. But it is urged that if the act of Congress cannot be construed as conferring the power, it may be derived from the appointment of this Commissioner, under a rule of the Circuit Court of the United States, adopted in January, 1851. That rule provides that the clerk of the Circuit Court and of the District Court, and their deputies, (the Commissioner in question being à deputy of the Clerk of the District Court,) shall be *ex officio* Commissioner of the Circuit Court; and shall be authorized to execute all the powers, and perform all the duties conferred by several acts of Congress, enumerating them, but of which the act of 1848, the one in question, is not included, " or of any act of Congress having relation to such Commissioners, and their duties or powers." These officers, thus appointed by the Circuit Court, are authorized, by the several acts enumerated, to take affidavits and bail in civil cases; and to arrest and commit for offences against the United States, and the latter clause of the rule provides for the performance of any other duties that may be conferred upon them by any other acts of Congress. Now it is apparent, unless it can be shown that the act of 1848 confers the power to act under the treaty in the extradition of fugitives upon these officers, this clause in the rule has no application to the case; and that no such power has been conferred by that act, if I am not greatly mistaken, has been already demonstrated. The rule of the court adds nothing to the argument in favor of the power, as that depends upon the act of Congress which provides for carrying the treaty into effect, and which confers the power only upon Commissioners, specially appointed by the Federal courts for this purpose. The treaty provides that the arrest of the alleged fugitive, and commitment for the purpose of a surrender, shall be made, "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed."

The act of Congress makes no provision on this subject, except as it respects the admissibility of a species of evidence

which will be noticed hereafter. The laws of New York, therefore, are to govern and regulate the Judge or Commissioner in hearing and determining the criminality of the prisoner, as he was found in that jurisdiction. This would be so even without the specific provision of the treaty, as the only mode of proceeding, in summary criminal proceedings before the Federal magistrates, is according to the practice before the State magistrates in analogous cases. The thirty-third section of the Judiciary Act of 1789, expressly provides that summary proceedings against persons for crimes committed against the United States, shall be agreeably to the usual mode of process against offenders in the State in which he may be found. I am not aware of any other act of Congress on the subject. This accords with the construction given to the treaty in the act of Parliament, 6th and 7th Victoria, which requires the production of such evidence as, according to the laws of that part of her Majesty's dominions where the prisoner is found, would justify his apprehension and committal for trial, if the crime had been there committed. According to the laws of New York, regulating these summary proceedings, in criminal cases, evidence is heard, as well on behalf of the accused as against him, and should have been so heard in this case. The 2d section of the act of Congress, to carry into effect the treaty, provides that on the hearing upon the return of the warrant of arrest, "copies of the depositions upon which an original warrant in any such foreign country may have been granted, under the hand of the person or persons issuing such warrant, and attested upon the oath of the party producing them, to be true copies of the original depositions, may be received in evidence of the criminality of the person so apprehended."

This species of evidence is exceedingly loose and unsatisfactory, in any aspect in which it can be viewed; but certainly it cannot be characterized as evidence of any description, unless it appears that the magistrate in the foreign country taking the depositions and issuing the warrant, had jurisdiction of the case, and was competent to perform these acts. Unless the authority exists, the acts are *coram non judice*, and void. And the rule is universal, that in the case of magistrates, or other persons of limited or special jurisdiction, any party setting up a right or title under, and by virtue of, their acts or proceedings, must first show affirmatively that they possessed jurisdiction or authority to act in the matter. The jurisdiction is never presumed. These are principles too familiar to require a reference to authorities. It was proved, in this case, that the person taking the depositions in Ireland, and issuing the warrant, acted as a justice of the peace; and, it has been contended, that affords

evidence not only of his appointment to that office, but also of the competency of his jurisdiction. I cannot assent to this doctrine. I admit that evidence of a person exercising the duties of a public officer, and even reputation of the fact, may dispense with the proof of a regular appointment, and if there is no question as to the extent of his power or authority, the proof will be sufficient. But if, in addition to the appointment, it becomes necessary to give evidence of his jurisdiction, neither his acting in the office, or reputation, furnishes any evidence of the fact. 1 Phillips, Ev. 432, 433, 450 ; C. & Hill's Notes, 280, 281 ; 3 Wend. 267. If a contrary principle can be found in the law, it is a little remarkable that the rule should ever have obtained that, in an action founded upon the adjudication or decision of a magistrate, or any other officer of special and limited jurisdiction, the party claiming a right under it, must aver and prove jurisdiction in the particular case, for the very adjudication, or decision, would afford all the necessary evidence of the officer acting as such within the principle contended for. In other words, the judgment would afford evidence *per se* of the jurisdiction, and in all cases dispense with further proof, and thus every inferior magistrate would be placed upon the footing of courts of general jurisdiction. I do not think it necessary to pursue this branch of the argument further, and am satisfied that the Commissioner acted, in the arrest and commitment of the prisoner, without any competent evidence of his guilt of the crime alleged against him. To permit the copies as evidence, without proof of the jurisdiction of the magistrate, would be against all principle, and might lead to the most scandalous abuses in carrying into execution the stipulations of the treaty. This species of evidence is very differently guarded, in the act 6th and 7th Victoria. There, copies of the depositions laid before the government, and upon which the proper officer issued his warrant to the magistrates, authorizing them to institute proceedings to arrest and commit the fugitive, are those only permitted to be given in evidence. In other words, copies of the depositions upon which the government acted in the matter, are admissible as evidence of the criminality. The original of these are those upon which our government make the requisition ; and, of course, the good faith of the nation is pledged that they were taken before competent officers, and that the facts stated in them were true. But, in the case before us, the copy was taken by a police officer of the foreign country, and produced here before the Commissioners, without the sanction of either government, and without any competent evidence of the authority of the person before whom it was taken. There was no evidence of the authority of this magistrate, or of any

authority under the treaty, for the arrest of the accused, before the Commissioner, but what depended upon the oral testimony of this officer, and the statement of the Consul, of what had been represented to him in the matter. The Consul does not aver that any of the facts stated by him, in what he calls his requisition upon the Commissioner, were within his own knowledge. Even the authority attempted to be derived from the Under Secretary of State in Ireland, depends upon the oral statement of this police witness; and I assert, and do so upon the responsibility that I know belongs to my place and the occasion, that there is not one word or scintilla of evidence in the record of the Commissioner, upon which the accused in this case has been tried and adjudged guilty, but depends entirely and exclusively upon the oral examination of this foreign police officer, who does not pretend that he had any personal knowledge of the commission of the crime. His knowledge only extends to the verification of the copy of the deposition taken before a person in Ireland, of whose authority to take it we know nothing. To those familiar with the criminal laws of this country, I need not say that such evidence, against any person charged with an offence against our laws, would be inadmissible and utterly worthless, and especially so, under the laws of the State of New York, which must govern in this case, unless otherwise regulated by act of Congress; and equally so, in my judgment, within a sound construction of the act providing for the admissibility of these copies of a deposition, taken before the foreign magistrate.

I have thus gone over the case much more at large than I should have deemed it necessary, were it not for the very great diversity of opinion in respect to it among my brethren. I have regarded it as a case of considerable importance, not only from the delicacy of the power involved in the treaty, the provisions of which we are called upon to interpret, but also from the principles lying at the foundation, which concern the rights and liberty of every citizen of the United States. I cannot but think the denial of the power to grant the writ of *habeas corpus*, in this case, is calculated to shake the authority of a long line of decisions in this court, from Hamilton's case, decided in 1795, down to the present one. That case, as understood and expounded in the case of Bollman and Swartwout, in 1807, which received the most deliberate consideration of the court, and to which the doctrine in Hamilton's case was applied, held that this great writ was within the cognizance of the court, under the 14th section of the Judiciary Act, in all cases where the prisoner was restrained of his liberty, " under, or by color of the authority of the United States," and no case has held the contrary since that

decision, with the exception of that of Metzger, decided in 1847, which, I have already stated, stands alone, but which distinctly admits the power and jurisdiction of the court in the case before us. This writ has always been justly regarded as the stable bulwark of civil liberty; and undoubtedly, in the hands of a firm and independent judiciary, no person, be he citizen or alien, can be subjected to illegal restraint, or be deprived of his liberty, except according to the law of the land. So essential to the security of the personal rights of the citizen was the uninterrupted operation and effect of this writ, regarded by the founders of the Republic, that even Congress cannot suspend it, except when, in cases of rebellion or invasion, the public safety may require it. I cannot, therefore, consent to cripple or limit the authority conferred upon this court by the Constitution and laws to issue it, by technical and narrow construction; but, on the contrary, prefer to follow the free and enlarged interpretation always given, when dealing with it by the courts of England, from which country it has been derived. They expound the exercise of the power benignly and liberally in favor of the deliverance of the subject from all unlawful imprisonment; and, when restrained of his liberty, he may appeal to the highest common-law court in the kingdom, to inquire into the cause of it. So liberally do the courts of England deal with this writ, and so unrestricted is its operation in favor of the security of the personal rights of the subject, that the decision of one court or magistrate upon the return to it, refusing to discharge the prisoner, is no bar to the issuing of a second, or third, or more, by any other court or magistrate having jurisdiction of the case, and it may remand or discharge, according to its judgment, upon the same matters. 13 M. & Welsby, 679; 9 Ad. & Ellis, 731; 1 East, 314; 14 Id. 91; 2 Salk. 503; 5 M. & Welsby, 47. Upon the whole, I am satisfied, that the prisoner is in confinement under the treaty and act of Congress, without any lawful authority. I am of opinion, therefore, that the writ of *habeas corpus* should issue in the case, to bring up the prisoner.

1. On the ground that the judiciary possesses no jurisdiction to entertain the proceedings under the treaty for the apprehension and committal of the alleged fugitive, without a previous requisition, made under the authority of Great Britain, upon the President of the United States, and his authority obtained for the purpose.

2. That the United States Commissioner, in this case, is not an officer within the treaty or act of Congress, upon whom the power is conferred, to hear and determine the question of criminality, upon which the surrender is to be made.

3. That there was no competent evidence before the Commissioner, if he possessed that power, to issue the warrant. And

4. Upon these grounds, the Circuit Court ought to have discharged the prisoner, instead of remanding him into custody, and its decision in the case is a proper subject of review by this court, by virtue of the writ of *habeas corpus.*

Mr. Chief Justice TANEY.

I concur in opinion with my brother Nelson. The questions involved in this application are very grave ones; and I should have felt it to be my duty to state the grounds on which my opinion has been formed, had not the whole subject been so fully and, to my mind, satisfactorily discussed by him. But, concurring, as I do, in all that he has said, I shall forbear any discussion on my part, and content myself with expressing my entire assent to the opinion he has just delivered.

Mr. Justice DANIEL.

The question just disposed of by the court, involving the lives and liberties, not only of those who from abroad may seek protection under our laws, but the lives and liberties of our own citizens, is undoubtedly one of the most important which can claim the vigilance of our government in every department. Having deliberately compared my own views of this vital question with what has been so well expressed by my brother Nelson, and concurring, as. I do, in all that he has said upon it, I deem it unnecessary to do more than thus solemnly to attest my adherence to the great principles of law, justice, and liberty vindicated by him.

### *Order.*

On consideration of the petitions for writs of *habeas corpus* and of *certiorari,* filed in this case, and of the arguments of counsel thereupon had, — It is now here considered, ordered, and adjudged by this court, that the writs prayed for be, and the same are hereby, denied; and that the said petitions be, and the same are hereby, dismissed.