# IN THE MATTER OF THE APPLICATION OF KO MATSUMOTO FOR A WRIT OF HABEAS CORPUS.

## December 4, 1915.

1. *Aliens—Immigration—Exclusion for offense of moral turpitude:* Adultery and perjury are offenses involving moral turpitude; and alien immigrants may be excluded from the United States therefor under section 2 of the Immigration Act (34 Stat. 898, am. 36 Stat. 263).

2. *Same—Same—Fair hearing before immigration inspectors— Benefit of counsel:* An alien immigrant who does not request aid of counsel in his preliminary examination before the immigration inspector or in the subsequent hearing before the board of special inquiry, but who thereafter has counsel and is furnished with a copy of the testimony taken at the examination and hearing, cannot complain of such want of counsel at the first stages as unfairness in the proceedings.

3. *Same—Same—Same—Interpretation of testimony:* Qualifications of interpreters and elements of fair interpretaion considered.

4. *Constitutional law—Examination of alien immigrant before immigration officers—Self-crimimnation—Confessions:* The immigration officers may place an alien immigrant on the witness stand and any answer which he gives voluntarily may be used against him.

5. *Habeas corpus—Bail on appeal from order dismissing writ:* Under rule 33 of the Ninth Circuit Court of Appeals and rule 34 of the Supreme Court, this court in its discretion may on dismissing a writ of habeas corpus admit to bail pending appeal the person in whose behalf the writ issued.    But to guard against delay the court in such cases may require the appeal to be perfected before the appellant's release.

*Habeas Corpus:* Hearing on return to writ.

*G. S. Curry* and *E. A. Douthitt* for the petitioner.
*Jeff McCarn*, U. S. District Attorney, for the respondent.

CLEMONS, J. The board of special inquiry of the immigration service at the port of Honolulu denied the petitioner a landing at that port "as a person who admits having committed a crime or misdemeanor involving moral turpitude, namely the commission of adultery with one Matsumoto, in the Territory of Hawaii; also as admitting having committed perjury by giving false testimony before the board of special inquiry while under oath, and as a person likely to become a public charge."

[1a] The admission of adultery is based on the following testimony of the petitioner, in her examination before the board on October 25th of this year, after she had earlier in the same hearing distinctly denied that she had committed adultery with Matsumoto, and had at a previous hearing on October 22d testified in a manner indicating her denial of any such offense.

"Q. Do you expect us to believe that you were refused a divorce by reason of your own adultery, and that Matsumoto pleaded guilty and spent six months in jail for the same reason and yet you were innocent? A. I never tell a lie. I will tell you the truth now, *I did commit adultery with Matsumoto* and also sued my former husband for divorce. (Transcript of proceedings, page 4). . . . . Q. Did you go to his room for the purpose of committing adultery or did he persuade you to do it after you arrived? A. I never went there to do it, and he didn't persuade me; *it just happened after I got there.* Q. Any further statement to make? A. Dr. Grossman knows that I wasn't making a *practice* of living with another man. You can ask him about it." (Transcript of proceedings, page 5).

The petitioner bases the present proceedings in habeas corpus on the following broad contentions, as finally relied

on in argument, though stated somewhat more in detail in the pleadings:

(1) Unfairness in failure of the board to call witnesses required by the petitioner in her hearing before it;

(2) Unfairness in her not being afforded counsel at the beginning of the hearing, or thereafter;

(3) Unfairness in the incompetence of the interpreter who translated questions and answers from English into Japanese or Japanese into English, as the case might be; particularly in that the interpreter was an Okinawa Japanese, speaking the Okinawa dialect of which the petitioner was ignorant;

(4) Denial of any admission of the commission of any crime or misdemeanor involving moral turpitude,—which includes not only (a) a denial of the fact of any such admission but also (b) a contention that what she is alleged to have admitted does not in law constitute any such crime or misdemeanor as is contemplated by section 2 of the immigration act, 34 Stat. 898, am. 36 Stat. 263;

(5) Denial that the petitioner is likely to become a public charge.

In view of my conclusion below, under ground (4), ground (5) will not be considered. I may say, though, that if this ground were determinative of the case, my conclusion would be very different.

Grounds (1), (2), and (3) I find nothing to sustain. And evidence has been adduced to make the solution of these questions very clear. Furthermore, as to ground (1), the evidence of what the two witnesses who are claimed to have been required would have testified to, was heard *de bene* because of the prospective absence of one and for the business convenience of the other, and it shows that they could neither of them say anything of any materiality in view of the petitioner's distinct admission discussed below under ground (4), or say anything except that the petitioner had been a faithful servant of each of them during her former residence in Honolulu and that they trusted her and would be glad to give her employment again. Their testimony

would have been very desirable under ground (5) above, if that ground had been conclusive.

[2] Aside from the want of facts to support grounds (1) and (2), the cases of *United States v. Sing Tuck,* 194 U. S. 161, 169, 170; *Law Wah Suey v. Backus,* 225 U. S. 460, 469, 470, may be referred to, among others, as to the law governing ground (2), want of counsel. The decision in the case of *United States ex rel. Buccino v. Williams,* 190 Fed. 897, affirmed in *United States ex rel. Falco v. Williams,* 191 Fed. 1001, says:

"There is nothing in the statute which calls for the presence of counsel at the examination of aliens preliminary to admission; nothing to indicate that it was the intent of Congress that these investigations in hundreds of thousands of cases touching the qualifications of an alien seeking to enter were to be conducted as trials in court, with counsel present to represent the alien, witnesses called to testify, and elaborate examination and cross-examination of them. On the contrary, Congress relegated this question to administrative boards who might act summarily and expeditiously, and, to provide against an abuse of their discretion, accorded to the alien a right of appeal to the Secretary of Commerce and Labor. Nor do the rules provide for the presence of counsel at such examinations."

And see *United States v. Greenwalt,* 213 Fed. 901, 905; *Ex. p. Chin Loy You,* 223 Fed. 833, 838-839, also 836-838; *Ex. p. Chin Kwock Wah,* 224 Fed. 138, 139; *Whitfield v. Hanges,* 222 Fed. 745, 749, par. 3; *In re Ryonosuke Sakaba,* ante, p. 372.

[3] As to ground (3), I may express specially my confidence in the conscientiousness of the interpreter and also in his qualifications, and note that the careful reading over of the testimony to the petitioner before she signed it, together with the repeated call for her objection if everything was not correct, reduced the possibility of error to a minimum—particularly as the petitioner's admission was in effect repeated in her words last above quoted, "it just hap-

pened after I got there" ("it" referring unmistakably to adultery), and the repetition was made at a time somewhat later in her examination than the time of the more direct admission. In other words, the later admission appears to be separate and distinct from, and perhaps uninfluenced by, the first admission. The circumstance that the interpreter was born an Okinawa Japanese, does not weigh against his extensive education and experience in the Japanese language, fully tested here in court by all counsel.

As to ground (4), subdivision (a), what I have just said indicates my satisfaction that the petitioner understood the interpreter and that she was correctly interpreted as having as a matter of fact made the admission of adultery—she being at the time of the offense a married woman and having a husband living.

[1b] There remains, then, the sole question, one of law, whether or not adultery is "a felony or other crime or misdemeanor involving moral turpitude". The cases of *United States v. Sibray*, 178 Fed. 144; *United States v. Uhl*, 211 Fed. 628, and *Ex parte Isojiki*, 222 Fed. 151, are cited for the proposition that it is not.

The identical question was before me in *In the Matter of Tome Tanno*, ante, p. 266, decided June 22, 1913, when I held adultery to be an offense involving moral turpitude; though not then having the advantage of reference to the decisions of other courts above cited. I there disposed of the matter rather summarily:

"It should require no discussion to establish to the mind of any one of moral sense, according to standards to which social policy can admit no exceptions, that her questioned act [adultery] was one of moral turpitude."

I then cited, without quoting, *Pollard v. Lyon*, 91 U. S. 225, which says at page 228:

"Beyond all doubt, offences of the kind involve moral turpitude," referring to adultery, see page 227.

I also cited, without quoting, *United States v. Bitty,* 208 U. S. 393, which says at page 401, what is pertinent and suggestive:

"Was that [concubinage] an *immoral* purpose within the meaning of the statute? . . . Beyond question . . . Congress had in view the protection of society against another class of alien women other than those who might be brought here merely for the purpose of 'prostituion'."

Also, at page 403: "The statute in question, it must be remembered, was intended to keep out of this country immigrants whose permanent residence here would not be desirable or for the common good, and we cannot suppose either that Congress intended to exempt from the operation of the statute the importation of an alien woman brought here only that she might live in a state of concubinage with the man importing her, or that it did not regard such an importation as being for an *immoral* purpose."

And I cited the case of *United States v. Uhl,* 203 Fed. 152, which says at page 154:

"'Moral turpitude' is a vague term. *Its meaning depends to some extent upon the state of public morals.* A definition sufficiently accurate for this case, however, is this: 'An act of baseness, vileness, or depravity in the *private and social duties* which a man owes to his fellow-man or to society."

Also cited without quotation was *Gomez v. Hawaiian Gazette Co.,* 10 Haw. 108, which says at page 111:

"Moral turpitude is defined to be an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow-man or to society in general, *contrary to the accepted and customary rule of right and duty between man and man",* quoting Newell on Defamation, and ruling that to charge a person with selling opium, an offense [which may perhaps be said to be in some degree merely *malum prohibitum*] punishable by imprisonment at hard labor, is to charge him with an offense involving moral turpitude.

Also, adultery is regarded as such an offense in *Ranger v. Goodrich,* 17 Wis. 80, 82-83.

The three decisions cited by petitioner's counsel, though the conclusions of able courts, cannot prevail as against the authorities just quoted. The court's discussion in the *Isojiki* case, 222 Fed. 151, seems unconvincing, and the court in the *Sibray* case, 178 Fed. 144, I respectfully submit, shows its misconception when it says, at page 150: "The answer is that the police power of the State of Pennsylvania must have control of those who offend against her laws." But this is not the "answer" at all; for it is not, of course, a case of Congress' administering the police power of any State but a question of Congress' right to say who may be admitted as desirable immigrants: Congress must let the State exercise its own police power unhampered, but in addition to any punishment to which an offender may be subject under such authority, Congress may punish the offender further by providing that his infraction of local laws shall make him, if an alien who has left the country, an undesirable person who cannot return.

If the decalogue, the moral precepts of the ages, and the rules of ecclesiastical law from early times, do not indicate that adultery is an offense involving moral turpitude, then our common teachings are hypocrisy. Note the following language of *In re Hopkins,* 103 Pac. 806, 806:

"This presents a question of right conduct from a purely moral standpoint, independent of the fact that the law prescribes a punishment for the making of such false statements. 'Thou shalt not bear false witness' was not only one of the ten commandments of the Mosaic law, but finds sanction in the teachings of Jesus as a standard of right under the new dispensation. Indeed, this standard of right seems to be a part of the moral consciousness of the race, and to be recognized by all peoples with any appreciation of moral ideals."

If we may not judge of moral turpitude by these standards, by what standards are we to judge of it? Even though adultery was not a crime at common law,—a fact which counsel urge to be significant and controlling,—it still re-

mains true that adultery is and has for centuries been denounced by the church and by society, and that in ecclesiastical law it was regarded as a ground of divorce, and even at common law, though the act was not recognized as criminal, it was held to be a cause of damages in a civil action by an offended spouse. See 1 Cyc. 952; 21 Cyc. 1626. That Christianity, which forbids adultery, may be looked to in determining the public sense of what is moral turpitude, see *Holy Trinity Church v. United States,* 134 U. S. 457, 470-471; Cooley, Const. Law, 7 ed. 669, et seq.

"This element of moral turpitude is necessarily adaptive; for it is itself defined by the state of public morals, and thus far fits the action to be at all times accommodated to the common sense of the community." *Beck v. Stitzel,* 21 Pa. 522, 524.

Any argument growing out of a difference between an offense *malum in se* and one merely *malum prohibitum,* would fall with any argument based on the fact that adultery was not a crime at common law.    See discussion, supra, and *Pullman Palace Car Co. v. Central Transportation Co.,* 69 Fed. 158, 164; 1 Black. Comm. (Cooley's 4th ed.) 50-51, n. 2 (*57, *58).

From the finding that the testimony was correctly and fairly interpreted, it follows that the petitioner committed perjury—which would alone suffice to exclude her from the country; for it could hardly be said that she did not by her testimony "admit" the commission of perjury when in her testimony admitting guilt, above quoted, she changed her testimony of the previous hearing, denying guilt.    See 20 A. & E. Enc. L., 2d ed. 872, and n. 6; 16 Id. 246-247, and cases cited.

[4] The question which has occurred to me as worthy of consideration in the petitioner's behalf, whether the circumstances did not make her admissions of guilt inadmissible in evidence on the principles applying to confessions, and so make the board's consideration of such

admissions a want of due process of law, or of fair trial, has been entirely removed by consideration of the very principles of the law, as it is, relating to confessions. See 1 Wigmore, Ev., secs. 848, 849, (and n. 3, p. 971), 851; 2 Chamberlayne, Ev., sec. 1569. See, also, 2 Wharton, Crim. Ev., 10th ed., secs. 664, 669. It may be noted in this connection, that Rev. Stat.; sec. 860, which might otherwise be contended as having some bearing on the question, has been repealed. 36 Stat. 352.

The competency of the government in such cases to swear the immigrant as a witness against himself, is established by the Circuit Court of Appeals for this circuit. *Low Foon Yin v. United States Immigration Com'r*, 145 Fed. 791, 793 et seq. And the Circuit Court of Appeals for the sixth circuit (Lurton, Severens, and Richards, JJ.), in *United States v. Hung Chang*, 134 Fed. 19, holds that:

"Admissions or statements of a defendant, voluntarily made to the officers by whom he is arrested, in answer to questions put by them either before or after his arrest, are admissible in evidence against him, and the government has the right to call and examine him as a witness." Syllabus, par. 1. See, also, Id. at page 25.

[5] The writ of habeas corpus is discharged and the petitioner remanded to the custody of the respondent. However, as petitioner's counsel have noted an intention to appeal, and as the petitioner appears to be a woman whom two responsible citizens, witnesses here in her behalf, are ready to employ in their own households, and who has been trusted by one of them as faithful and steady in her work as nurse and housemaid in his family, and it is not apparent that she is a woman of vicious tendencies but had once lapsed from virtue under conditions of ill-treatment by her husband, from whom she has since been divorced, and as her paramour, if he may be so called, a steady and reliable laborer, is now to marry her and provide for her, the proposed motion of her counsel for release on bail will be enter-

tained with favor, but not, however, until after her appeal has been perfected to the extent of the filing of a petition and assignment of errors and execution of an approved bond on appeal, and with the understanding that the transcript of testimony and the record on appeal shall be completed within thirty days from the time of allowance of the appeal. This attitude of the court is a precaution, warranted from experience, against want of good faith and delay in appeals. The amount of the bail bond will be $500. This order is made, in spite of the ruling cited by the district attorney, of *United States v. Sisson,* 220 Fed. 538, 540-541, which flies in the face of rule 33, sec. 2, of the ninth Circuit Court of Appeals, and of rule 34, sec. 2, of the Supreme Court, made pursuant to Rev. Stat., sec. 765, and which errs,—it may be worth while to note,—in its statement that, "a writ of habeas corpus does not put the relator into the custody of the court." *Barth v. Clise,* 12 Wall. 400, 402; *In re Wilkins,* 71 N. H. 591, 53 Atl. 1019; *In re Grant,* 26 Wash. 412, 67 Pac. 73; 15 A. & E. Enc. L., 2d ed., 213-215. The case of *In re Kaine,* 14 How. 103, is cited by this encyclopedia to the same effect as the later decision of *Barth v. Clise,* supra, and is also regarded in the same way by Judge Blatchford, *In re Hamilton,* 1 Ben. 453, 11 Fed. Cas. 319, 320, No. 5,976; and in spite of language of Mr. Justice Curtis in the case of *Kaine,* 14 How. at page 121, Mr. Justice Nelson's view at pages 133-134, in which the Chief Justice and Mr. Justice Daniel concur specially, at page 148, without doubt expresses the view of the court at that time, and later expressed in the case of *Barth v. Clise*—in which the reporter cites in a note the earlier case of *Kaine.* See 12 Wall. 402, note.

---

*Appeal dismissed* for non-compliance with rules 23 and 24, Circuit Court of Appeals, Ninth Circuit.